**Sam P. SGRO, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 79–1236.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1979.

Decided Dec. 3, 1979.

Rehearing Denied Jan. 15, 1980.

R. Russell Mather, U.S. Dept. of Justice, Washington, D.C., for defendant-appellant.

Craig A. Randle, Springfield, Ill., for plaintiff-appellee.

Before CUMMINGS and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.**

HARLINGTON WOOD, Jr., Circuit Judge.

We address the question whether a security agreement that grants a sole shareholder a lien on the assets of a close corporation to secure a note made by the purchasers of his interest is a "commercial transactions financing agreement" within the meaning of section 6323(c) of the Internal Revenue Code, 26 U.S.C. § 6323(c) (1976). The relative priority of that lien and a federal tax lien, upon which the Internal Revenue Service (IRS) has levied, depends on the resolution of this issue.

■ State law governs the vast majority of conflicts between lienholders competing for the same property. However, when one of the competitors, as here, is the United States Government holding a lien for unpaid taxes,[1] federal law governs. *United States v. Pioneer American Insurance Co.*, 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963); *United States v. City of New Britain*, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954); *Avco Delta Corporation Canada Ltd. v. United States*, 484 F.2d 692 (7th Cir.

---

** Senior District Judge William J. Campbell of the United States District Court for the Northern District of Illinois is sitting by designation.

1. Section 6321 of the Internal Revenue Code, 26 U.S.C. § 6321 (1976), provides:

   If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

1973), *cert. denied*, 415 U.S. 931, 94 S.Ct. 1444, 39 L.Ed.2d 490 (1974). Specifically, the Federal Tax Lien Act of 1966, 26 U.S.C. §§ 6321–6326 (1976), outlines the rights of private creditors with respect to a federal tax lien.

■ Although the Act generally conforms to the notion that a lien first in time is first in right, a plethora of particularized rules govern the determination of priorities and consequently the resolution of this case. *See generally* Overman, *Federal Tax Liens: A Guide to the Priority System of Section 6323 of the Internal Revenue Code*, 16 B.C. Indus. & Com.L.Rev. 729 (1975). Our analysis begins with the rule that a federal tax lien arises "at the time the assessment is made." 26 U.S.C. § 6322 (1976). That the Government might not file notice until some future date, if at all, does not affect the immediate attachment of a tax lien when liability is admitted or assessed. Seemingly unencumbered property may therefore in fact be subject to a "secret" tax lien, which remains undisclosed until the Government files notice. The resulting uncertainty for those engaged in secured credit transactions is obvious.

■ Subsection (a) of section 6323 provides a measure of protection for the holders of certain interests. Notwithstanding the attachment of a tax lien upon assessment, this subsection provides that purchasers, holders of security interests, mechanics lienors, and judgment lien creditors will prevail if their interest attaches before the Government files appropriate notice. Attachment occurs at the moment the interest becomes choate, which is a question of federal law. *Texas Oil & Gas Corp. v. United States*, 466 F.2d 1040, 1051 (5th Cir. 1972), *cert. denied*, 410 U.S. 929, 93 S.Ct. 1367, 35 L.Ed.2d 591 (1973). If "the identity of the lienor, the property subject to the lien, and the amount of the lien are established" before the Government files notice, those falling within the statutory class will prevail over a prior tax lien. 347 U.S. at 84, 74 S.Ct. at 369; *see* Plumb, Federal Tax Liens 149–50 (3d ed. 1972 & Supp.1974). Consequently, when a complete record search

does not disclose a tax lien, holders of the interests listed above can rest assured that as of that date their interest, if choate, is not compromised by a prior tax lien.

Subsection (c) recognizes that some regular business transactions require the holders of the interests enumerated in subsection (a) to take inchoate liens on secured property. For example, a common way to secure a line of credit is to use one's accounts receivable as collateral. Such a loan may be secured by the outstanding balances in the debtor's accounts receivable at the time the loan is made and by further balances as they become due. *See* S.Rep.No.1708, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Admin.News, pp. 3722, 3729. Since a subsequently arising balance is not in existence at the time the loan is made, the resulting lien remains inchoate until the underlying debt becomes due. Similarly, the further advancement of funds on the same secured line of credit does not give rise to a choate lien until the funds are actually advanced and the amount of the lien can be established. In both instances, the resulting lien remains unprotected by subsection (a) until it becomes choate and therefore would be subject to a tax lien filed in the interim. A lender seeking assurances that his loans are secured by accounts receivable that are not subject to prior tax liens would have to examine the records each time the underlying debts change or he makes further advances secured by the same accounts receivable—a task most lenders are unable or unwilling to undertake.

"[T]o keep this obligation within practical bounds," *id.*, Congress provided in subsection (c) for relief in certain very narrow circumstances:

> (c) Protection for certain commercial transactions financing agreements, etc.—
> (1) In general.—To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—

(i) a commercial transactions financing agreement,

(ii) a real property construction or improvement financing agreement, or

(iii) an obligatory disbursement agreement, and

(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

\* \* \* \* \* \*

26 U.S.C. § 6323(c)(1) (1976). Congress, however, limited the relief provided therein to loans extended within forty-five days of the filing of notice or, if earlier, when the lender has actual notice of the filing. *Id.* § 6323(c)(2)(A). With the enactment of subsection (c), lenders engaging in accounts receivable financing and similar transactions that meet the statutory requirements need only perform a records search every forty-five days to be assured that the accounts receivable on which they hold a lien are unencumbered by a prior tax lien.

Since the priority accorded security interests that arise from the enumerated transactions abrogates the "first in time" rule, the requirements of subsection (c) are exceedingly strict. The plaintiff-appellee, Sgro, nevertheless contends his lien arose from a prior "commercial transactions financing agreement" and therefore has priority regardless of when it became choate.[2] To prevail, Sgro must show that he took his lien pursuant to an agreement that meets the Code's strict requirements:

(2) Commercial transactions financing agreement.—For purposes of this subsection—

(A) Definition.—The term "commercial transactions financing agreement" means an agreement (entered into by a person in the course of his trade or business)—

(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, or

(ii) to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business;

but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing.

*Id.* Judge Ackerman, in an order dated December 19, 1978, found that "the security agreement and financing statement here fall within the ambit of this section."[3] The court accordingly entered judgment for Sgro in the amount of $15,071.04, which represents the product of Government levies on the taxpayer's accounts receivable and a seizure of funds from its cash register and safe. The Government appeals from that judgment. We reverse.

Until July 1, 1975, Sgro was the sole shareholder of Sgro Construction, Inc. (the Corporation). On that date, Sgro sold his interest in the Corporation to a syndicate of three purchasers in exchange for a cash payment of $25,000 and a $400,000 note executed jointly by the purchasers and the Corporation. To secure payment of the note, the same parties entered into a security agreement naming as collateral the assets of the Corporation including its accounts receivable.[4] On the following day,

---

**2.** The Government does not dispute that Sgro's lien became choate within the 45-day grace period.

**3.** *Sam P. Sgro v. United States*, No. S–Civ.–76–0057 (S.D.Ill. Dec. 19, 1978).

**4.** The Corporation's assets consisted principally of the accounts receivable, fixtures, inventory, and equipment of the St. Nicholas Hotel in Springfield, Illinois. In addition, Sgro took a security interest in the shares of stock sold to the syndicate and in a land trust. The latter two items, however, are not relevant to this appeal.

Sgro perfected his lien by filing an appropriate financing statement with the Illinois Secretary of State and the Sangamon County Recorder of Deeds.

On January 15, 1976, the IRS assessed the Corporation $22,231.21 for unpaid employment and withholding taxes. On February 2, 1976, the IRS filed notice of a tax lien for the unpaid balance, $18,460.54, and promptly served notices of levy upon various businesses whose accounts contained outstanding balances owed to the Corporation. After recovering $10,429.27 on these levies, IRS agents, on February 6, 1976, seized the contents of the Corporation's cash register and safe, which together yielded $4,641.77.

When the syndicate defaulted in its payments on the note, Sgro took possession of the Corporation's tangible assets and instituted appropriate foreclosure proceedings. At those proceedings (*Sgro I*),[5] Judge Ackerman entered summary judgment in favor of Sgro and against the United States on the ground that Sgro perfected his security interest in the tangible assets before the IRS filed notice of its tax lien. The Government did not appeal.

Sgro then brought suit under section 7426 of the Internal Revenue Code, 26 U.S.C. § 7426 (1976),[6] to recover the product of the Government's levies on the Corporation's account debtors and the seizure from its cash register and safe pursuant to the same tax lien at issue in *Sgro I*. The parties stipulated to the *Sgro I* finding that the July 1, 1975 security agreement between Sgro, the purchasers, and the Corporation gave rise to a security interest in the Corporation's assets that is valid under Illinois law. In addition, their arguments indicate they are in substantial agreement that the applicable law is accurately represented by the following statement:

However "complete" a lender's perfection may be under state recording laws and however "specific" state law might deem that interest to be, it is federal law that determines the extent to which that state determination will protect a private lien from a federal tax lien. It appears clear from the case law that an account receivable not yet "acquired" at the time of the filing of a tax lien because the final transaction creating the account receivable was not yet in existence cannot be considered choate, save for those accounts receivable now protected by Section 6323(c).

*Texas Oil & Gas Corp. v. United States*, 466 F.2d at 1051.

As one would expect, where the parties agree on the facts and the law, they are likely to disagree on the application of the latter to the former. Such is the case here. The Government contends that under federal law its lien is superior unless Sgro can establish that the accounts receivable were due and owing to the Corporation and the funds seized from its safe were in its possession before February 2, 1976, the date on which the Government filed notice of its tax lien. Sgro concedes that the proceeds of the levies and seizure did not meet these requirements and that his lien was therefore inchoate under federal law on that date. He argues, however, that the security agreement falls within the statutory exception to the choateness requirement for "commercial transactions financing agreements," 26 U.S.C. § 6323(c)(1)(A)(i) (1976), and that he therefore is entitled to judgment in his favor because the account debts became due and the seized funds came into the Corporation's possession within forty-five days of the tax lien filing.

---

**5.** *Sam P. Sgro v. United States*, No. S–Civ.–76–0062 (S.D.Ill. Dec. 30, 1977).

**6.** Section 7426 provides in pertinent part:
(a) Actions permitted.—
(1) Wrongful levy.—If a levy has been made on property or property has been sold pursuant to a levy, any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary or his delegate.

Subsection (c)(2)(A), which defines a "commercial transactions financing agreement," contains the prerequisites to the applicability of subsection (c)(1)(A)(i). First, the agreement must have been "entered into by a person in the course of his trade or business . . . ." And second, the agreement must be one providing for the extension of loans "to the taxpayer." *Id.* § 6323(c)(2)(A)(i).[7]

Nothing in the record suggests that Sgro was engaged in any activity that qualified as a "trade or business" for tax purposes.[8] Rather, the picture it paints is the simple one of an investor selling his stock in a close corporation. It is well-settled that one's personal investment activities are not a "trade or business." *Whipple v. Commissioner*, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963); *Higgins v. Commissioner*, 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783 (1941); *United States v. Trigg*, 465 F.2d 1264 (8th Cir. 1972), *cert. denied*, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973). Even assuming for the moment that Sgro's management of the corporation was a "trade or business," the sale of his stock marked his *exit* from that position. Accordingly, the security agreement was not entered "in the course" of his management of the Corporation. Had Sgro's dominant motivation for taking the note been to protect his employment with the Corpora-

tion, we might have reached a different result on this issue. *Cf. United States v. Generes*, 405 U.S. 93, 92 S.Ct. 827, 31 L.Ed.2d 62 (1972); *Niblock v. Commissioner*, 417 F.2d 1185 (7th Cir. 1969).

The district court's conclusion that the July 1, 1975 security agreement was a "commercial transactions financing agreement" reads out of the statute the requirement that such an agreement be entered in the course of the secured party's "trade or business." In *Bjork v. United States*, 486 F.2d 934, 937 n.3 (7th Cir. 1973), this court recognized that satisfaction of the parallel requirement of subsection (c)(4) is a prerequisite to according the same priority to an "obligatory disbursement agreement." We see no reason to treat the "trade or business" requirement in subsection (c)(2) differently.

Alternatively, we hold that the agreement securing payment of the purchase price for Sgro's stock in the Corporation is not an agreement "to make loans to the taxpayer" within the meaning of subsection (c)(2)(A)(i). Rather, the agreement merely grants Sgro an interest securing the note that the purchasers of the stock executed jointly with the Corporation. Even if we were to read the purchase agreement and the security agreement conjunctively as a single agreement "to make loans" secured by the Corporation's assets—an issue we

---

**7.** In addition, subsection (c)(2)(A)(i) applies only when such loans are "to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business." Although this requirement is not at issue, we note that subsection (c)(2)(C) includes accounts receivable within its definition of "commercial financing security."

Sgro does not contend on appeal that the transactions were entered pursuant to an agreement "to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business. . . ." 26 U.S.C. § 6323(c)(2)(A)(ii) (1976). Nevertheless, our resolution of the question whether the transaction satisfied the "trade or business" requirement of subsection (c)(2)(A)(i) would be dispositive of an attempt to invoke the protection of subsection (c)(2)(A)(ii).

**8.** Sgro's sole contention on this issue is that since the Government did not so argue in the

trial court, it is foreclosed from raising the issue on appeal. We disagree. At trial, the Government argued that the July 1, 1975 security agreement did not qualify as a "commercial transactions financing agreement." In so arguing, it focused on the failure to meet the statutory requirement that the agreement be "to make loans to the taxpayer." In this court, the Government now adds the failure to satisfy the "trade or business" requirement to its argument that the statute is inapplicable on its face and, in doing so, relies on the same factual record. We are cognizant of the general rule forbidding an appellant from raising new issues on appeal. However, we retain discretion to hear new grounds supporting the facial inapplicability of a statute provided further factual findings are not needed. *See Commissioner v. Gordon*, 391 U.S. 83, 95 n.8, 88 S.Ct. 1517, 20 L.Ed.2d 448 (1968).

reserve—it would still fall beyond the scope of subsection (c)(2)(A)(i). Construing the agreement in this way, it is clear that the "loan" was extended not "to the taxpayer," *i. e.,* the Corporation, but instead to the purchasers of Sgro's stock.

The result we reach is consistent with the role Congress intended section 6323(c) to play in the statutory scheme of the Federal Tax Lien Act of 1966, 26 U.S.C. §§ 6321–6326 (1976). Its purpose in part is to give "an inventory or accounts receivable, etc., financier assurance that his loans or purchases are not inferior to some recently filed tax lien as long as he searches the records at least once every 45 days." S.Rep.No.1708, 89th Cong., 2d Sess., *reprinted in* [1966] U.S.Code Cong. & Admin.News, pp. 3722, 3729. Because subsection (c)(2) abrogates the general rule of first in time, first in right, Congress narrowly defined its applicability to a specific problem posed by the exigencies of commerce. It chose not to extend protection to those whose engagement in the enumerated transactions is not incident to their "trade or business" and to those who extend loans to debtors other than the taxpayer. We are powerless to rewrite the clear words of the statute even if we thought it desirable.

In light of the foregoing, the Government's tax lien held priority on the accounts receivable and the funds contained in the cash register and safe. The levies and seizure therefore did not compromise Sgro's rights. Accordingly, we reverse the judgment of the district court.

Reversed.