OPINION OF THE COURT
John R. Tenney, J.
The plaintiffs, Martin S. Auer and Lawrence Sloane, bring this action against the Power Authority of the State of New York (PASNY) and the Chase Manhattan Bank. They act in their capacity as residential consumers of electricity supplied by the Niagara Mohawk Power Corporation, which purchases electricity from PASNY.
The Power Authority of the State of New York was originally established in 1931 under chapter 772 of the Laws of 1931 which has been amended on numerous occasions, the most recent being chapter 55 of the Laws of 1979.
The plaintiffs are seeking a declaratory judgment that PASNY’s 1974 bond resolution (known as the General Purpose Bond Resolution) and Ninth Supplemental Gen *944 eral Purpose Bond Resolution be declared in violation of sections 1001 and 1005 of the Public Authorities Law, the Niagara Redevelopment Act (US Code, tit 16, §§ 836, 836a) and the Federal Power Commission License of St. Lawrence. The General Purpose Bond Resolution provides that after the retirement of the bonds for the St. Lawrence and Niagara projects and the refinancing of the bonds of the Fitzpatrick and Blenheim-Gilboa projects (hereinafter 1970 Bonds) all future revenues from all PASNY projects will be pledged to the payment of the 1974 general purpose bonds and any new series issued. Plaintiffs object to the pledge of all revenues, specifically, hydroelectric revenues, to the total bond issue.
The defendants have moved to dismiss plaintiffs’ complaint on the grounds that it does not state a cause of action pursuant to CPLR 3211 (subd [a], par 7). Issue has not been joined. However, all parties have furnished the court with affidavits which concede that there are questions of fact. The parties join in an application to treat this as a motion for summary judgment under CPLR 3211 (subd [c]) and agree no further notice from the court is required..
Plaintiffs contend that if the revenues from hydroelectric power from the Niagara and St. Lawrence Projects are used to offset capital costs of other projects throughout the State, it will result in an illegal rate for domestic and rural consumers in violation of subdivision 5 of section 1005 of the Public Authorities Law.
PASNY and the defendant Chase Manhattan Bank argue that if plaintiffs’ position is upheld, it will create an automatic default in the bond issue because such a narrow construction of the Power Authority Act (Public Authorities Law, art 5) will result in a breach of the covenant. Defendants argue that section 1005 of the Public Authorities Law must be read with other sections, and other law, and that also previous interpretations of the law by the authority must be given full force and effect.
PASNY argues that it can interpret the Power Authority Act, and it has the “force of jud icial interpretation”. (Matter of Lezette v Board of Educ., 35 NY2d 272, 281; Town of Amherst v County of Erie, 236 App Div 58, 61, affd 260 NY *945 361; New York City Housing Auth. v Nesmith, 100 Misc 2d 414.) It also contends that its previous interpretations have been accepted by the Legislature or at least not questioned. Thus, its position is strengthened. (City of Tullahoma v Coffee County, Tenn., 328 F2d 683, 691, cert den 379 US 989; Kranker v Levitt, 68 Misc 2d 224, affd 30 NY2d 574.) The fact that the annual report to the Legislature may have reflected departures from the statutory intent cannot be deemed ratification by the Legislature. (Edenwald Contr. Co. v City of New York, 86 Misc 2d 711, affd 47 AD2d 610; Matter of Kern v Kern, 65 Misc 2d 765; see, also, ICF report, at V-26.)
An administrative body may interpret a statute under the following conditions: (1) There is a doubt or an ambiguity in the law requiring practical construction, or (2) There is a general statute requiring specific application. (City of Tullahoma v Coffee County, Tenn., supra; Town of Amherst v County of Erie, supra; Matter of Lezette v Board of Educ., supra, p 281; Matter of Howard v Wyman, 28 NY2d 434; McKinney’s Cons Laws of NY, Book 1, Statutes, § 76.) The subject statute is not ambiguous or general. It establishes a precise, definite policy for the use of hydroelectric power from the Niagara and St. Lawrence Projects.
The statutory provisions for which a declaration by the court is requested are:
Subdivision 5 of section 1005 of the Public Authorities Law: “5. To develop, maintain, manage and operate those parts of the Niagara and Saint Lawrence hydroelectric projects owned or controlled by it in such manner as to give effect to the policy hereby declared (and all plans and acts, and all contracts for the use, sale, transmission and distribution of the power generated by such projects, shall be made in the light of, consistent with and subject to this policy), namely, that such projects shall be in all respects for the aid, improvement, and benefit of commerce and navigation in, through, along and past the Niagara river, the Saint Lawrence river and the international rapids section thereof, and that in the development of hydroelectric power therefrom such projects shall be considered primarily as for the benefit of the people of the state as a whole and particularly the domestic and rural consumers to *946 whom the power can economically be made available, and accordingly that sale to and use by industry shall be a secondary purpose, to be utilized principally to secure a sufficiently high load factor and revenue returns to permit domestic and rural use at the lowest possible rates and in such manner as to encourage increased domestic and rural use of electricity. In furtherance of this policy and to secure a wider distribution of such power and use of the greatest value to the general public of the state, the authority shall in addition to other methods which it may find advantageous make provision so that municipalities and other political sub-divisions of the state now or hereafter authorized by law to engage in the distribution of electric power may secure a reasonable share of the power generated by such projects, and shall sell the same or cause the same to be sold to such municipalities and political subdivisions at prices representing cost of generation, plus capital and operating charges, plus a fair cost of transmission, all as determined by the trustees, and subject to conditions which shall assure the resale of such power to domestic and rural consumers at the lowest possible price, provided, however, that in disposing of hydro-electric power pursuant to and in furtherance of the aforementioned policy and purposes, appropriate provision may also be made to allocate a reasonable share of project power to agencies created or designated by other states and authorized to resell the power to users under the same terms and conditions as power is disposed of in New York state. To that end, the authority may provide in any contract or contracts which it may make for the sale, transmission and distribution of the power that the purchaser, transmitter or distributor shall construct, maintain and operate, on such terms as the authority may deem proper, such connecting lines as may be necessary for transmission of the power from main transmission lines to such municipalities or political subdivisions.” (Emphasis supplied.)
Subdivision 3 of section 1010 of the Public Authorities Law: “3. Except as may be otherwise expressly provided by the authority, the bonds and notes of every issue shall be general obligations of the authority payable out of any moneys or revenues of the authority, subject only to any *947 agreements with the holders of particular bonds or notes pledging any particular moneys or revenues.”
Section 1010 (subd 6, par [a]) of the Public Authorities Law: “6. (a) [Pledging all or any part of the revenues of the project or any revenue producing contract or contracts made by the authority with any individual, partnership, corporation or association to secure the payment of the bonds or of any particular issue of bonds, subject to such agreements with bondholders as may then exist.”
Subdivision 7 of section 1010 of the Public Authorities Law: “7. Notwithstanding any other provisions of this title, any such resolution or resolutions shall contain a covenant by the authority that it will at all times maintain rates, fees or charges sufficient to pay, and that any contracts entered into by the authority for the sale, transmission or distribution of power shall contain rates, fees or charges sufficient to pay the costs of operation and maintenance of the project, the principal of and interest on any obligations issued pursuant to such resolution as the same severally become due and payable, and to maintain any reserves required by the terms of such resolution or resolutions.” The Power Authority had pledged the revenue, if any, as derived from “the operation of any project”. It has covenanted with the holders of the bonds to maintain rates, fees or charges to produce revenues sufficient to cover the costs of operation, maintenance, debt service and required reserves.[1] There is no indication that it agreed to violate the policy spelled out in subdivision 5 of section 1005 nor is there any history of any ruling or interpretation by the authority of a similar intent. However, this is the first time a PASNY bond issue has used this language.[2]
If there is a conflict between the pledge of all revenues and the maintenance of sufficient rates with the obligation to provide certain hydroelectric power at the lowest possible rate, it can be resolved. It is necessary for the court to *948 seek a method to uphold the legality of the statutes. (McKinney’s Cons Laws of NY, Book 1, Statutes, §§ 71-98, 144.) The Power Authority Act should be considered in its entirety and if there are conflicts, they should be reconciled where possible.[3]
The policy is that hydroelectric projects shall benefit the “people of the state as a whole” and “particularly the domestic and rural consumers at the lowest possible rates * * * so as to encourage increased domestic and rural use of electricity.”[4] (Public Authorities Law, § 1005, subd 5; emphasis supplied.) To further that policy, the authority is also mandated to furnish a reasonable share of hydroelectric power to “municipalities and other political subdivisions” at a price based upon costs. It is also authorized to develop other projects for the “additional needs” of those customers. (Public Authorities Law, § 1005, subd 6.)
There is nothing in the section which defines “lowest possible rate” or “lowest possible price” which are both used with reference to rural and domestic customers. The authority must make an effort to secure industrial users and pass any benefits back to rural and domestic consumers. The court cannot agree with PASNY’s argument that the phrase “lowest possible rates” is solely for the purpose of establishing a condition for sales to industry. Broad discretion is given to the authority to determine the components of its costs, and it is not required to guarantee any specific rate. It may include a reasonable charge for depreciation of the hydroelectric facilities and such other factors which the exercise of business accounting principles would allow. However, the authority must be able to establish that the rate to domestic and rural consumers is as low as *949 possible and that industrial revenues, if any, from hydro-power are applied for that purpose.[5]
The statute establishes a precise formula based upon costs for determining price of hydropower sold to municipal and political subdivisions. There is no suggestion that this formula is to be applied to the sale to domestic and rural consumers. There is no limitation or guideline for determining “lowest possible rate” other than the responsibility of the authority to seek contracts of sale to industry as a secondary purpose “to secure a sufficiently high load factor and revenue returns” to permit the accomplishment of that purpose. An interpretation that would permit the lowest possible rate to be less than cost[6] would be absurd, and it must be presumed that the Legislature never intended such a result. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 146.)
Once there is evidence that the lowest possible rate within this limitation has been established, PASNY will have fulfilled its statutory obligation. If there are still excess revenues, there is no statutory prohibition which would prevent the transfer of such revenues to the general fund.
PASNY contends that the policy does not apply to rural and domestic users who receive their power from Niagara Mohawk Power Corporation or other investor-owned utilities. Subdivision 5 of section 1005 of the Public Authorities Law does not make such a distinction. In fact, in authorizing the sale to a “purchaser, transmitter or distributor” the statute states that such contracts “shall provide for the effectuation of the foregoing policy”, and this phrase is repeated elsewhere to emphasize the importance of. the policy. The resale rate of “such power” shall be “no higher than those at which the power was purchased from the authority”.[7] (Public Authorities Law, § 1005, subd 6, par d.) Thus, hydropower furnished for the use by domestic and *950 rural consumers whether direct from the authority, from a municipal or political subdivision or an investor-owned utility, must be sold by the authority at the lowest possible rates and no charges other than a handling cost may be added upon resale to domestic and rural consumers.
The statutory policy of subdivision 5 of section 1005 need not be inconsistent with the rate covenants and the rate pledge in the General Purpose Bond Resolution. The authority is directed to “construct, improve and/or rehabilitate (a) such hydroelectric or energy storage projects *** (b) such base-load nuclear generating facilities ** ** * or other facilities” as in its judgment are necessary. Under subdivision 3 of section 1010 of the Public Authorities Law it is authorized to issue general obligation bonds “payable out of any moneys or revenues of the authority” to finance such projects. It is authorized to pledge “all or any part of the revenues of the project or any revenue producing contract or contracts made by the authority with any individual, partnership, corporation, or association”. (Public Authorities Law, § 1010, subd 6, par [a].)
The subject bond issue pledges all revenue as derived from any project. It appears that the authority is pledging revenue from all hydroelectric projects.[8] Revenue is not defined in the statute. For the purposes of this decision, revenue to be utilized for the benefit of domestic and rural consumers will be defined as that money which remains after all reasonable charges have been withdrawn. Revenue for the purpose of the bondholders will be defined as all *951 funds of the authority after it has fulfilled all statutory obligations.
PASNY argues that such a conclusion is an unreasonable construction of this section; that it fails to take into consideration that “the bonds and notes of every issue shall be general obligations of the authority payable out of any moneys or revenues”. (Public Authorities Law, § 1010, subd 3.) Section 1010 (subd 6, par [a]) authorizes the pledging of all or any part of the revenue of a project. The authority has construed “project” to mean “projects” citing the language of section 1012, “that such projects shall be in all respects self-supporting.” The argument that this means the projects shall be collectively self-supporting has no basis. It is PASNY’s attempt to extend its authority and use its revenues from financially successful projects to underwrite high cost or loss items. This may be a worthy purpose, but it is simply not authorized. It has the power to pledge its revenue from contracts to various projects and to make the bonds general obligations, but the Legislature has mandated that each project be substantially self-supporting. If there is an inconsistency, it is up to the court to interpret all the sections in a manner which will sustain the validity of the act. (McKinney’s Cons Laws of NY, Book 1, Statutes, §§ 96, 97.) If there are general and specific provisions, the specific should prevail over the general. (People v Mobil Oil Corp., 48 NY2d 192, 200.) Section 1005 must be considered a specific provision.
In considering the pledge of the General Purpose Bond Resolution, it must be concluded the bonds and notes are payable out of revenues of the authority which it has the power to utilize or divert. PASNY is specifically prohibited from diverting revenue from the restricted hydropower unless it has met the policy requirement. The statement that the bonds and notes are general obligations is not an expression of an intent to supersede a legislative policy. A bondholder may hold the authority to its pledge of all available moneys and revenues properly included in PAS-NY’s general fund and its agreement to maintain sufficient rates within the legal limitations imposed. (Public Authorities Law, § 1010, subd 7.)
*952 In making such a ruling, the court is not restricting any powers granted by the Legislature. (Commissioner of Internal Revenue v Gordon, 391 US 83; Bissette v Colonial Mtge. Corp. of D. C., 477 F2d 1245.) To the contrary, the court is adhering to a far more basic principal; only the Legislature can legislate, the administrator is restricted to the guidelines set out by the Legislature. The courts are limited to a review and a determination that the legislative guidelines have not been exceeded and to make reasonable interpretations of the legislative intent. The court cannot accept PASNY’s argument that all of its interpretations become the law and can supersede the clear intent of the Legislature. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 129, subd b.) It is a creature of the Legislature and can only acquire its power from the Legislature. If it is not satisfied with the legislative action or it need broader powers, it must seek assistance from the Legislature. It cannot establish its own guidelines nor can it ask a court to extend its power by some casual assumption of judicial authority to legislate in the interest of all the people of the State of New York. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 73.) Only the Legislature has the constitutional authority to speak for the people since it must answer to the people directly. In Matter of Kasper v O’Connell (38 Misc 2d 3, 5) the court said: “An administrative agency is a creature of the Legislature. It possesses no inherent legislative power and must strictly confine the exercise of its delegated authority within the boundaries of the Legislature’s mandate. However much courts may defer to administrative expertise, they may not countenance action which patently contravenes the vires expressly laid down in the enabling statute; they may not ‘sanction administrative lawlessness’ (Peters v Hobby, 349 US 331, 345). ‘Administrative practice may not thwart a statute the purposes of which are as clear as those here involved’ (Matter of Hines v LaGuardia, 293 NY 207, 216; Matter of Walling v Schechter, 7 NY2d 814); administrative adjudication may not employ a ‘standard different from that fixed by the Legislature’ Fuld, J., concurring in Matter of Barry v O’Connell, 303 NY 46, 53); an administrative regulation may not ‘put into the body of the statute a limitation which *953 [the Legislature] did not think it necessary to prescribe’ (Morrill v Jones, 106 US 466, 467; Acorn Employment Serv. v Moss, 292 NY 147; Matter of Gross v New York City Alcoholic Beverage Control Bd., 7 NY2d 531).”
No statute requires that PASNY charge the same rate for power to all customers. Its mandate is to develop a continuous and adequate supply of dependable electrical power and energy. It may provide for the generation of power by various methods.
Therefore, the court declares as follows:
1. The provisions of the General Purpose Bond Resolution do not violate existing law.
2. PASNY may not divert the revenue as defined herein from Niagara or St. Lawrence hydroelectric power to finance other projects.
3. Sales of St. Lawrence and Niagara hydroelectric power to industrial users shall be a secondary purpose to be utilized principally to secure a sufficiently high load factor and revenue returns to permit domestic and rural use at the lowest possible rates.
4. There is nothing in the statute which requires or authorizes the furnishing of hydroelectric power to rural or domestic users at less than cost as defined in section 1005 of the Public Authorities Law.
5. Hydroelectric power from the Niagara and St. Lawrence projects shall be particularly for the benefit of domestic and rural consumers to whom the power can economically be made available and priority shall be given to those consumers in allocating such power.
6. Once the “lowest possible rate” for domestic and rural consumers of St. Lawrence and Niagara hydroelectric has been established within the guidelines of this opinion and PASNY has met its statutory requirements, excess revenues may be added to the general fund.

. The revenue pledge provides in part: “The full faith and credit of the Authority are hereby pledged for the payment ***. In addition, *** pledged for such payments *** all revenue, rates, fees, charges, rents and other income and receipts as derived from the operation of any project.” (General Purpose Bond Resolution, art V, § 501.)
The rate covenant provides: “The Authority shall at all times maintain rates, fees or charges which will produce Revenues in each year sufficient i) to pay costs of operation and maintenance *** ii) to pay the bond service”.

. See section 501 of article V of the 1954 and 1970 Bond Resolutions.

. It is necessary to consider the Public Authorities Law, the Niagara Redevelopment Act and the Federal Power Commission License in an analysis of the Power Authority Act.
All recognize the existence of preference customers and the requirement that power be sold at the lowest rates. The IGF report suggests that the Public Authorities Law mandates a rate based upon the cost, but this is not an accurate interpretation of the law. (IGF Inc. Report, “Impacts of Potential Changes in the Rates and Power Allocation of the Power Authority of the State of New York [PASNY]” submitted to the Department of Energy, April 4, 1980.)

. Defendants concede that the sale of hydroelectric power sold to industry is to subsidize the rate of rural and domestic consumers. (Power Authority of State of New York, Reply Mem, p 15.)

. The policy is to be carried out whether the sale is to public agencies or companies. (Public Authorities Law, § 1005, subd 5, par g.) In the IGF report (p 1-4) PASNY argues that it meets its preference requirements by sales to customers of IOU’s which receive PASNY power.

. Costs are defined as: “cost of generation, plus capital and operating charges, plus a fair cost of transmission”. (Public Authorities Law, § 1005, subd 5.)

. This practice has been and is still followed by the authority in its sale of hydropower to investor-owned utilities.

. The Niagara Redevelopment Act (US Code, tit 16, § 836) states that “at least 50 per centum of the project power shall be available for sale * * * for the benefit of the people * * * particularly domestic and rural customers * * * at the lowest rates reasonably possible”. To further this policy, preference was to be given to public bodies and nonprofit co-operatives. Also, with the same policy in mind, sales to neighboring states of a reasonable portion of the 50% preference project power, not to exceed 20% were required. The Power Authority Act does not recognize the 50% provision as a limitation. It refers to “the development of hydroelectric power” without regard to percentages. It speaks of allocating “a reasonable share” to other States but again makes no percentage limitation. (Public Authorities Law, § 1005, subd 5.) Much hydroelectric power is allocated in a manner which apparently does not meet the requirements of the present law. (See Assembly Report of the Sub-Committee on Public Power; 1977-1978, p 13.)
An analysis of the information in the IGF report indicates that PASNY has not even met the “at least 50% requirement”. In the report, PASNY argues that its sale to IOU’s which in turn, sell to domestic and rural consumers is compliance. This is an acceptable “method” under section 1005 so long as the policy is not ignored and the preferential treatment is continued. (IGF Report, p IV-7.)