**In re GARY & CONNIE JONES DRUGS, INC., d/b/a Laswell Drugs, Debtor.**

**Bankruptcy No. 83–20167.**

United States Bankruptcy Court, D. Kansas.

Dec. 7, 1983.

---

Stuart E. Bodker, Kansas City, Mo., Charles E. Kelly, III., Overland Park, Kan., for debtor.

Steven R. Anderson, Shawnee Mission, Kan., for creditors, Simons.

Janice Miller Karlin, Asst. U.S. Atty., Kansas City, Kan., Glen R. Dawson, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., for United States.

Chris Henry, Kansas City, Kan., Trustee.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Bankruptcy Judge.

This matter came on for hearing on July 28, 1983, on an Application of Jack and Linda Simons, for payment of secured claim. The debtor, Gary & Connie Jones Drugs, Inc., appeared by counsel, Stuart E. Bodker, and local counsel, Charles E. Kelley, III. Creditors, Jack and Linda Simons, appeared by counsel, Steven R. Anderson of Wagner, Leek & Mullins. The United States appeared by Janice Miller Karlin, Asst. U.S. Attorney, and Glenn R. Dawson, Trial Attorney for the Department of Justice, Tax Division. The trustee, Chris Henry, also appeared.

### FINDINGS OF FACT

Based on the exhibits, testimony of witnesses and pleadings filed herein, the Court finds as follows:

1. That the Court has jurisdiction of the parties and subject matter; and venue is proper.

2. That on July 24, 1979, the Simons sold a drugstore and its assets to the debtor for $110,400.00. The sale included $19,995.36 in inventory. The debtor executed a note and security agreement granting the Simons a security interest in the assets, including "... *equipment and trade fixtures and merchandise inventory described in Exhibit A attached hereto and included herein by reference, presently owned and located at the property commonly known as 3017 Strong Avenue...*" (emphasis added).[1] In the following paragraph of the security agreement, the debtor covenanted to keep the inventory at approximately the same stock level as on the day of the sale, and to bring any significant drop in the stock level to the attention of the Simons. The Simons were also given the right to inspect the inventory.

3. That the Simons perfected their security interest by filing financing statements with the Wyandotte County Register of Deeds on July 26, 1979; and with the Kansas Secretary of State on July 27, 1979.[2] The financing statements listed "*all furniture, equipment, trade fixtures and merchandise inventory located on the premises ...*" The box stating that products of collateral were also secured was checked.

4. That on September 22, 1982, the Internal Revenue Service filed a Notice of federal tax lien with the Kansas Secretary of State for unpaid 1980 corporate income taxes and 1981 employment tax liabilities, in the total amount of $18,677.54.

5. That on March 4, 1983, the debtor filed a Chapter 7 petition in bankruptcy.

6. That on April 11, 1983, the Simons filed a reclamation complaint against the debtor, trustee, United States and the state of Kansas. On April 29, 1983, the United States and the state of Kansas were dismissed as party defendants, at the Simons' request. At that point, the Simons believed that their lien was undisputedly superior to the tax liens of the United States and state of Kansas and that said tax liens would be released.

7. That on May 17, 1983, the drugstore and assets were sold to Bill Bond Pharmacy, Inc., for $25,000.00, pursuant to this Court's authorization.[3] The parties stipulate that the proceeds comprised of: $15,000.00 in inventory; $9,000.00 in furniture, fixtures and equipment; and $1,000.00 in general intangibles. The parties also stipulate that the United States has a superior lien against the $1,000.00 proceeds of general intangibles and the Simons have a superior lien against the $9,000.00 proceeds of furniture, fixtures and equipment. On October 31, 1983, the Court ordered the trustee to pay the $9,000.00 to the Simons and the $1,000.00 to the United States.

8. That the Simons were pharmacists and were not engaged in lending money in the regular course of their business.

9. That Bill Bond, a pharmacist and sole shareholder of Bill Bond Pharmacy, Inc., testified that 90% of the items of inventory he purchased on May 17, 1983, had been on the debtor's shelves since September 22, 1982.[4] He could not answer what percentage of the $15,000.00 *value* of inventory purchased predated September 22, 1982; he could only testify to what percentage of the *quantity* of inventory purchased predated September 22, 1982. Mr. Bond further testified that he owned a nearby pharmacy and had occasion to visit the debtor's drugstore during the months preceding the bankruptcy. He testified that the debtor was selling old inventory and not replacing it with much new inventory.

10. That Gary Jones, pharmacist, president, manager and inventory purchaser for the debtor prior to the bankruptcy, testified

---

1. Exhibit A did not list the items of inventory specifically.

2. Perfection of the security interest in inventory was effective upon filing with the Secretary of State, K.S.A. 84–9–401(1)(c).

3. The trustee is holding the proceeds.

4. His affidavit stated 98% but affidavits are not evidence.

that 50% to 55% of the value of the inventory sold to Bill Bond had been purchased by the debtor before September 22, 1982. He further testified that although he did not replace all of the inventory as it was sold, he continued to purchase inventory even within the last thirty days before the bankruptcy. He also testified that he had a close out, half price sale just prior to the bankruptcy.

## CONCLUSIONS OF LAW

### I.

The first issue is whether or not the Simons had a perfected security interest in the inventory the debtor acquired after they sold the drugstore to the debtor in July of 1979. There is no dispute that the inventory on hand at the time of the sale has long been sold or discarded, and that the inventory in stock at the time of the notice of tax lien was all after acquired. The United States contends that its tax lien is superior because the Simons did not have a validly perfected security interest in *after acquired* inventory.

The United States specifically points to the language in the security agreement granting the Simons a security interest in inventory "... *presently owned and located at the property* ..." The United States contends that that language, coupled with the lack of an after acquired property clause, defeats the Simons' claimed security interest in after acquired property.

The Court found no Kansas statutory or case law regarding the proper way to create a security interest in after acquired property. K.S.A. 84–9–204(1) [the Uniform Commercial Code] states that security agreements *may* provide for security interests in after acquired property, but gives no guidance as to how this is done. There is one Kansas case that indicated an improper way to create such a security interest. In *John Deere Co. v. Butler County Implement*, 232 Kan. 273, 655 P.2d 124 (1982), the court held that a security agreement granting an interest in a specific list of inventory did not include after acquired inventory irrespec-

tive of language granting a security interest in "... *any and all increases, additions, accessions, substitutions and proceeds thereto and thereof* ..." The court found that the parties could not have *intended* to cover after acquired property since they listed each item of inventory covered.

■ There are two schools of thought regarding the creation of security interests in after acquired inventory. Some courts require an express after acquired clause in the security agreement. See *In re Taylored Products, Inc.*, 5 UCCRS 286 (USDC W.D. Mich.1968); *Evans Products Co. v. Jorgensen*, 245 Or. 362, 421 P.2d 978, 3 UCCRS 1099 (1966); see also 2 Gilmore, Security Interests, § 35.5 (1965). The majority view appears to be to determine the parties' *intent*, applying a reasonable man test to the facts and circumstances; that is, if a reasonable man looking at the entire security agreement and financing statement would recognize that the parties intended to secure after acquired inventory. See *In re Fibre Glass Boat Corp.*, 324 F.Supp. 1054 (S.D.Fla.1971); *In re Page*, 16 UCCRS 501 (USDC M.D.Fla.1974); *In re Beverage*, 30 UCCRS 373 (Bkrtcy.Ct.M.D.Pa.1980). See also 4 Anderson, Uniform Commercial Code, § 9–204:9 (1971).

Courts applying the reasonable man test invariably find that the parties intended to secure after acquired inventory despite the absence of an after acquired clause. They find that given the nature of inventory, constantly flowing in and out of the debtor's possession, as a matter of common sense, the parties generally intend to secure after acquired inventory. See *Whitworth v. Krueger*, 20 UCCRS 1368 (Idaho S.Ct. 1976).

This Court finds that the reasonable man test is preferable to strict construction. An underlying purpose and policy of the UCC is to permit the continued expansion of commercial practices through custom, usage and agreement of the parties. K.S.A. 84–1–102(2)(a). The UCC provisions should be construed liberally, to give effect to the parties' intent and customary way of doing business, where not in direct conflict with

the UCC. Moreover, the Kansas Supreme Court indicated in *John Deere Co. v. Butler County Implement, supra,* that the parties' intent is determinative of whether a security interest covers after acquired property.

■ Applying the reasonable man test to the instant facts, the Court finds that the debtor intended to give the Simons a security interest in present and after acquired inventory. This intent is evidenced by the covenant to keep a stable level of inventory and the Simons' right to periodic inspection of the inventory. If the Simons were not secured by after acquired inventory, such provisions would be unnecessary and meaningless. Therefore, this Court finds that the Simons have a perfected security interest in the after acquired inventory.

## II.

■ The second issue before this Court is whether the United State's tax lien is prior and superior to the Simons' lien against the $15,000.00 in inventory proceeds. The priorities of tax liens and security interests is to be resolved under criteria established by federal law. *United States v. Pioneer American Insurance Co.,* 374 U.S. 84, 83 S.Ct. 1651, 10 L.Ed.2d 770 (1963); *United States v. New Britain,* 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520 (1954).

First, 26 U.S.C. § 6321 (Internal Revenue Code of 1954) provides that whenever a taxpayer fails to pay a tax assessed against it after notice and demand for payment, a lien arises in favor of the United States against all property and property rights of the taxpayer. The lien arises on the date of the assessment. 26 U.S.C. § 6322.

■ However, the lien is not valid against a purchaser or holder of a security interest whose interest becomes choate prior to the filing of the notice of tax lien. *United States v. New Britain, supra,* at 86, 74 S.Ct. at 370; *Sgro v. United States,* 609 F.2d 1259, 1261 (7th Cir.1979). Where the United States has perfected its interest by filing a notice of tax lien, and the other claimant has a choate lien, priority is determined by the rule of "first in time, first in

right". *United States v. Vermont,* 377 U.S. 351, 354, 84 S.Ct. 1267, 1269, 12 L.Ed.2d 370 (1964); *United States v. New Britain, supra,* 347 U.S. at 85, 74 S.Ct. at 370. An interest becomes choate only when the identity of the lienor, the property subject to the lien, and the amount of the lien are established. *United States v. Pioneer American Insurance Co., supra,* 374 U.S. at 89, 83 S.Ct. at 1655; *Sgro v. United States, supra,* at 1261.

Thus, under § 6323(a) of the Internal Revenue Code, a security interest in after acquired inventory is inferior to a tax lien, to the extent of any inventory that was inchoate, i.e., inexistent at the time the notice of tax lien was filed. *Rice Inv. Co. v. United States,* 625 F.2d 565, 573 (5th Cir. 1980).

In 1966 the provisions of Section 6323(c) were adopted to relieve commercial lenders of the stringent requirements of the "choateness" doctrine, given that commercial lenders frequently took inchoate security interests in after acquired inventory or accounts receivable. H.R. 1884, 89th Cong., 2d Sess., pp. 7–10 (1966–2 Cum.Bull. 815, 819–821); S.R. 1708, 89th Cong., 2d Sess., pp. 7–10 (1966–2 Cum.Bull. 876, 880–882), U.S.Code Cong. & Admin.News 1966, p. 3722.

Section 6323(c) states as follows:
"§ 6323. Validity and priority against certain persons.

*(c) Protection for certain commercial transactions financing agreements, etc.—*

*(1) In general.—To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—*

*(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting—*

*(i) a commercial transactions financing agreement,*

*(ii) a real property construction or improvement financing agreement, or*

(iii) an obligatory disbursement agreement, and

(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation."

Under section 6323(c) Congress gave limited relief to commercial lenders by providing that in certain circumstances a security interest in after acquired property can have priority over a tax lien for 45 days from the filing of the notice of tax lien. That is, the security interest will be superior to the tax lien with respect to collateral acquired within 45 days after the filing of the notice of tax lien.

■ Section 6323(c) is an exception to the choateness rule and it is to be strictly construed and narrowly defined. H.R. 1884, 89th Cong., 2d Sess., pp. 7–10 (1966–2 Cum. Bull. 815, 819–821); S.R. 1708, 89th Cong., 2d Sess., pp. 7–10 (1966–2 Cum.Bull. 876, 880–882); Plumb, Federal Tax Liens (3d ed.) The parties herein disputed the applicability of § 6323(c)(1)(A)(i). The United States contends that it is not applicable because the transaction between the Simonses and the debtor was not a "commercial transaction financing agreement". The debtor contends that it was.

Commercial transaction financing agreement is defined in § 6323(c)(2)(A) as follows:

"(2) Commercial transactions financing agreement.—For purposes of this subsection—

(A) Definition.—The term 'commercial transactions financing agreement' means an agreement (entered into by a person in the course of his trade or business)—

(i) to make loans to the taxpayer to be secured by commercial financing security acquired by the taxpayer in the ordinary course of his trade or business, or

(ii) to purchase commercial financing security (other than inventory) acquired by the taxpayer in the ordinary course of his trade or business;

but such an agreement shall be treated as coming within the term only to the extent that such loan or purchase is made before the 46th day after the date of tax lien filing or (if earlier) before the lender or purchaser had actual notice or knowledge of such tax lien filing."

The threshold requirement of any agreement alleged to be a "commercial transactions financing agreement" is that the agreement be entered into by the secured creditor "in the course of his trade or business". Treasury Regulations on Procedure and Administration (1954 Code), Section 301.6323(c)–1(b), Appendix A states:

" * * * Four purposes of this paragraph, a loan or purchase is considered to have been made in the course of the lender's or purchaser's trade or business if such person is in the business of financing commercial transactions (such as a bank or commercial factor) or if the agreement is incidental to the conduct of such person's trade or business. For example, if a manufacturer finances the accounts receivable of one of his customers, he is considered to engage in such financing in the course of his trade or business. [Emphasis added.] "

In Sgro v. United States, supra, the Seventh Circuit reversed the District Court and found the transaction at issue therein was not a commercial transaction financing agreement. There Sgro, the sole shareholder of Sgro Construction, Inc., sold his stock to a syndicate, taking a note and security interest in the corporation's assets. At p. 1264 the Court stated:

"It is well settled that one's personal investment activities are not a 'trade or business' ... [citations omitted] ... Even assuming for the moment. that Sgro's management of the corporation was a 'trade or business' the sale of his stock marked his exit from that position. Accordingly, the security agreement was not entered 'in the course' of his management of the Corporation."

■ The instant case is quite analogous. The Simonses were pharmacists engaged in the sale of drugs. They were not commer-

cial lenders. Their sale of the drugstore to the debtor was a one time transaction that marked their exit from the pharmaceutical business. The sale was not entered into in the course of their management of the store. Rather, it was the termination of their management of the store. Thus, the commercial transaction financing agreement exception is not applicable herein, and the choateness doctrine applies.

Accordingly, the Court finds that the Simons' inchoate security interest in inventory acquired after the September 22, 1982 notice of tax lien is inferior to the lien of the United States. The Court thus finds that the Simons' security interest is superior with respect to inventory acquired before September 22, 1982.

### III.

The final issue is how much of the $15,000.00 in inventory proceeds comprises inventory acquired before, and after, September 22, 1982. The Court heard testimony from two witnesses. Bill Bond, whose corporation purchased the store from the debtor, testified that 90% of the *quantity* of inventory purchased on May 17, 1983, had been on the shelves since before September 22, 1982. He stated that he could tell the age of the items from information on the price stickers, expiration dates on pharmaceutical items and the shopworn appearance of the items. He also testified that he had personal knowledge that the debtor was selling old inventory but not replenishing it with much new inventory in the months before the bankruptcy.

Gary Jones, on the other hand, testified that only 50% to 55% of the *value* of the inventory sold to Bond had been on the shelves since before September 22, 1982, and 45% to 50% of the value of the inventory had been acquired after that date. The Simonses attempted to impeach Jones' testimony based on Jones' purported tax liability to the extent the debtor does not pay the IRS in full. See *Emshwiller v. United States,* 565 F.2d 1042 (8th Cir.1977) where the court upheld an IRS assessment against a corporate employee who had been responsible for the corporation's withholding of taxes from employees' wages.

Despite Jones' possible stake in the outcome of this proceeding, this Court finds that his testimony is more credible than Bond's testimony. This Court has the discretion to choose whose testimony to believe based on witness demeanor and manner of testifying. *Volis v. Puritan Life Ins. Co.,* 548 F.2d 895, 901 (10th Cir.1977).

Furthermore, other evidence corroborates Jones' testimony. When Jones bought the store in 1979 the inventory level was at $19,000.00. This level was presumably maintained, as required by the security agreement. When the store was sold to Bond in 1983, the level had dropped to $15,000.00. The Court believes this $4,000.00 drop in inventory was due to the close out sale Jones had and Jones' admitted decrease in new inventory purchased in the months prior to bankruptcy. If Jones had virtually stopped buying new inventory, as Bond testified, surely there would have been less than $15,000.00 inventory on hand when Bond bought the store. Jones' testimony that 45% to 50% of the inventory had been acquired after September 22, 1982, appears accurate.

The Court therefore finds that the Simonses had a choate security interest and superior lien in 50% of the inventory, or $7,500.00 of the proceeds, at the time the notice of tax lien was filed. The other $7,500.00 in inventory was acquired after the notice of tax lien, and the I.R.S. has a superior lien against it.

IT IS THEREFORE, BY THE COURT, CONSIDERED AND ORDERED That the trustee distribute the $15,000.00 in inventory proceeds as follows: $7,500.00 to the Simonses; and $7,500.00 to I.R.S.