**OCCIDENTAL CHEMICAL CORPORATION, the Pillsbury Company, General Mills, Inc., Bethlehem Steel Corporation, Nabisco Brands, Inc., and Union Carbide Corporation, Plaintiffs,**

v.

**The POWER AUTHORITY OF the STATE OF NEW YORK, Defendant.**

**CIV–90–208C.**

United States District Court, W.D. New York.

March 11, 1992.

Sutherland, Asbill & Brennan (Earle H. O'Donnell, and Michael L. Denger, of Counsel), Washington, D.C., for plaintiff Occidental Chemical Corp.

Connors & Vilardo (Kevin A. Ricotta, of Counsel), Buffalo, New York, for plaintiffs Occidental Chemical Corp. and The Pillsbury Co.

Couch, White, Brenner, Howard & Feigenbaum (Algird F. White, Jr., of Counsel), Albany, N.Y., for plaintiffs General Mills, Inc., Bethlehem Steel Corp., Nabisco Brands, Inc., and Union Carbide Corp.

Charles M. Pratt (Arthur T. Cambouris, of Counsel), New York City, for defendant Power Authority of the State of New York.

Damon & Morey (Sharon M. Porcellio, of Counsel), Buffalo, N.Y., for defendant Power Authority of the State of New York.

CURTIN, District Judge.

## BACKGROUND

This case involves a question of statutory construction: Does the Niagara Redevelop-

ment Act ("NRA"), 16 U.S.C. § 836(b)(3), prohibit the Power Authority of the State of New York ("PASNY") from selling Replacement Power from its Niagara hydroelectric project at a rate greater than its cost of producing that power? Plaintiffs seek a declaratory judgment that PASNY's decision to increase its Replacement Power rates beginning on January 1, 1990, is contrary to the NRA. Defendant contends that the NRA does not mandate a cost-based rate for Replacement Power.

## FACTS

There are no facts in dispute. Although the court set out the facts in its prior order, *Occidental Chem. Corp. v. Power Auth. of the State of New York*, 758 F.Supp. 854, 856–57 (W.D.N.Y.1991) ("*OCC v. PAS-NY*"), given the importance of the issue here, an outline of those facts is again necessary. *See also Federal Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 100–06, 80 S.Ct. 543, 545–48, 4 L.Ed.2d 584 (1960) (detailing history surrounding passage of NRA).

Prior to the enactment of the NRA by Congress on August 31, 1957, a private utility—the Niagara Falls Power Company ("NFPC"), predecessor company of the Niagara Mohawk Power Corporation ("Niagara Mohawk")—controlled the hydroelectric power-generating capabilities of the Niagara River. Around the turn of the century, NFPC built two hydroelectric facilities on the Niagara: the Adams Plant and the Schoellkopf Station. The Adams Plant generated approximately 80,000 kilowatts ("kW"), and the Schoellkopf Station generated approximately 365,000 kW. In the beginning, NFPC obtained water flow to support these facilities from grants issued by the New York State legislature. After 1909, however, when Canada and the United States signed the Boundary Waters Treaty, the diversion of water from the Niagara for power generation was gov-

erned by international agreement. Then, with the passage in 1920 of the Federal Water Power Act, NFPC was required to obtain a federal license for its Niagara facilities. NFPC obtained a fifty-year license from the Federal Power Commission ("FPC") on March 2, 1921. 1 F.P.C. 16 (Item 43, Exhs. 12–14).[1] As this was the sixteenth license issued by the newly formed FPC, NFPC's twin hydroelectric plants came to be known as Project 16. NFPC was granted additional small allocations of water in 1926 and 1928, *see* Item 43, Exhs. 13–14, and a larger allocation in 1941, after an agreement between the United States and Canada to divert more water for hydroelectric power generation. *See* 2 F.P.C. 461 (Item 43, Exh. 28).

In 1950, the United States and Canada signed a new treaty ("1950 Treaty") which authorized the United States to divert a larger portion of water from the river than Niagara Mohawk could utilize at its twin hydroelectric plants. 1 U.S.T. 694.[2] During ratification, the United States Senate attached a reservation to this treaty which prohibited redevelopment of the Niagara River without express congressional authorization. *Id.* at 699. The enactment of this reservation precipitated a seven-year debate in Congress over how to best develop and allocate hydroelectric power from the Niagara resource. Three main questions occupied Congress: (1) Should public bodies and nonprofit cooperatives be given preference to Niagara power and, if so, what form should the preference clause take?; (2) How much power, if any, should be reserved for preference customers in adjacent states?; and (3) Who should be licensed to develop the Niagara resource—a private utility, PASNY, or the federal government? Only the last of these questions directly concerns us here.

Following ratification of the 1950 Treaty, Niagara Mohawk and other private utilities

---

**1.** Item numbers cited herein filed in *Occidental Chem. Corp. v. Power Auth. of the State of New York*, CIV–90–208, are cited without special notation. The companion case, *General Mills, Inc. v. Power Auth. of the State of New York*, CIV–90–391, has now been consolidated into *OCC v.*

*PASNY*, CIV–90–208. *See* Item 46. Items filed in this case prior to consolidation are referred to as GM Item ___.

**2.** It was at about this time that NFPC became Niagara Mohawk.

were the first to seek congressional authorization to develop additional generating capability. Support for this proposition was strongest in the House, where in 1953 the House passed a bill which provided for private development. *See* H.R.Rep. No. 862, 85th Cong., 1st Sess. 2, *reprinted in* 1957 U.S.C.C.A.N. 1585 ("House Report") (Item 42, Exh. 3). Public-power advocates succeeded in having this bill blocked in the Senate, however. These advocates supported development by PASNY, which in 1951 was authorized by the New York State legislature to develop the Niagara River. *See generally* N.Y. Pub.Auth.Law § 1000 *et seq.* (McKinney 1982). Prior to 1951, PASNY was limited to developing a hydroelectric facility on the St. Lawrence River. *See id.* While Congress debated these alternatives, Canada quickly developed additional hydroelectric power-generating capabilities and was permitted to use the United States' share of Niagara water.

On June 7, 1956, a rock slide destroyed Niagara Mohawk's Schoellkopf Station and its 365,000 kW generating capability. The Adams Plant was not affected, but it generated only 80,000 kW. The loss of this power from the Niagara region was potentially devastating to the industries that had located in the region to take advantage of NFPC's low-cost hydroelectric power. NFPC had generated low-cost power from the river for more than fifty years. The price of this power was, by 1915, regulated by the New York Public Service Commission ("NYPSC"), when NFPC filed its first rate tariff. *See* Item 43, Exh. 16. NFPC charged high-load users[3] in the Niagara Falls area approximately three mills[4] per kilowatt hour ("kWh") for this power. *See* Item 38, ¶ 6 (explaining rate calculations). This rate was maintained by NFPC up through the destruction of the Schoellkopf Station. *Id.*, ¶¶ 7–9. With the loss of this low-cost source of power, industries were suddenly forced to purchase much more expensive power from Canada, and Canadi-

an sources could not guarantee that this power would be available for any length of time. This crisis brought new urgency to congressional deliberations over development of the river. Congress was very concerned that, given the increased cost and uncertain availability of power to meet their needs, industries in the Niagara region might be forced to leave the area, with serious adverse consequences for the region's economy. Accordingly, Congress quickly resolved its differences and enacted the NRA.

The NRA directed the FPC, since renamed the Federal Energy Regulatory Commission ("FERC"), to issue a license to PASNY to construct and operate a hydroelectric power project on the Niagara River to utilize all of the water allocated to the United States by treaty with Canada. 16 U.S.C. § 836(a). Given the additional water allocation, the new project was capable of producing 1,800,000 kW of firm power, nearly four times the power output of Niagara Mohawk's obsolete power stations. Congress directed the FPC to include in the license, in addition to those conditions deemed necessary by it under the Federal Power Act, 16 U.S.C. § 791a *et seq.*, seven additional conditions governing the distribution and sale of the new project's power. The first condition granted "public bodies and nonprofit cooperatives within economic transmission distance" preference to acquire fifty percent of the project's power. 16 U.S.C. § 836(b)(1). This power was to "be made available at the lowest rates reasonably possible and in such manner as to encourage the widest possible use...." *Id.* Preference power not purchased by public power companies could be sold to private utilities, as long as "flexible arrangements" were made "to meet the reasonably foreseeable needs of the preference customers." *Id. See Power Auth. of the State of New York v. Federal Energy Regulatory Comm'n*, 743 F.2d 93, 103–07 (2d Cir.1984) ("*PASNY v. FERC*") (inter-

---

**3.** The term "high-load user" refers to industries that contract for a steady stream of power, 24 hours a day. The Niagara River is perhaps the best river in the world at supplying a non-stop stream of water for hydroelectric use.

**4.** One mill is equal to one tenth of a cent.

preting preference clause of NRA). The second condition directed PASNY to make available to preference customers in neighboring states up to twenty percent of the fifty percent available to preference customers in New York. 16 U.S.C. § 836(b)(2).

The third condition is at the center of this case. It provided that PASNY "shall contract, with the approval of the Governor of the State of New York, pursuant to the procedure established by New York law" to sell to Niagara Mohawk, "for a period ending not later than the final maturity date of the bonds initially issued to finance" the Niagara project, 445,000 kW of project power

> for resale generally to the industries which purchased power produced by project 16 prior to such date, or their successors, *in order as nearly as possible to restore low power costs to such industries* and for the same general purposes for which power from project 16 was utilized....

16 U.S.C. § 836(b)(3) (emphasis added). The requirement that PASNY contract to sell this power to Niagara Mohawk hinged on a proviso that Niagara Mohawk agree to surrender its FPC license for Project 16 and waive any claims for damages. *Id.* This block of power was designed to "replace" power lost to local industry as a result of the rock slide, and thus came to be called "Replacement Power." Prior to the rock slide, approximately 273,000 kW of the 445,000 kW generated by Niagara Mohawk's Project 16 went to Niagara Falls industries at the three mill rate. The balance of Project 16 power was sold to other customers in the region at a higher rate. *See* Item 47 at 4–6.

Of the remaining four conditions set forth in the NRA, only the fifth condition has any relevance to this case.[5] It provided:

> In the event project power is sold to any purchaser for resale, contracts for such sale shall include adequate provisions for establishing resale rates, to be approved by the licensee [PASNY], consistent with paragraphs (1) and (3) of this subsection.

16 U.S.C. § 836(b)(5).

During the seven-year debate in Congress leading to passage of the NRA, numerous hearings were held, *see, e.g.* Item 42, Exhs. 6–11 (excerpts of hearing transcripts), and more than twenty bills were introduced. Several early bills called for private development. Other bills called for federal development. By the time of the rock slide, however, the overwhelming sentiment in Congress was to designate PASNY to develop the project. Plaintiffs argue that the main reason Congress chose PASNY over a private developer was that PASNY, as a nonprofit governmental agency, could produce the power more cheaply. PASNY could do this for three reasons: (1) it was exempt from state and federal taxes; (2) it could finance new construction less expensively through the sale of tax exempt bonds; and (3) as a nonprofit agency, it would not need to offer shareholders a rate of return on their investment. *See* Item 38, ¶¶ 23, 28. This appears to have been one of the reasons Congress selected PASNY to develop the Niagara River. *See* House Report, *supra,* at 7 ("The power can be produced by the power authority at a cost below that of other available sources of power."). There is no evidence, however, that it was the only reason.

In fact, the idea behind § 836(b)(3) did not originate in Congress. This provision stemmed from an accommodation between Niagara Mohawk and PASNY reached after the June 7, 1956, rock slide in which Niagara Mohawk not only abandoned its efforts to obtain congressional authorization to develop the full United States allocation of water, but stated its willingness to relinquish its own licensed allocation of water, and to waive all claims for compen-

---

5. The fourth condition permitted PASNY to access or build transmission lines to distribute Niagara power. 16 U.S.C. § 836(b)(4). The sixth condition permitted PASNY, in conjunction with the State of New York, to spend up to $15,000,000 on a scenic drive and park on the American side of the Niagara River near Niagara Falls. 16 U.S.C. § 836(b)(6). Finally, the seventh condition required PASNY to reimburse the United States for its expenses engineering and/or constructing remedial works relating to the 1950 Treaty. 16 U.S.C. § 836(b)(7).

sation and/or damages associated therewith. In return, PASNY agreed to sell to Niagara Mohawk the same amount of power previously produced by the Adams Plant and the Schoellkopf Station—445,000 kW—for a period ending on the final maturity date of the bonds sold by PASNY to finance the new project. This accommodation would extend Niagara Mohawk's access to the 445,000 kW perhaps by thirty years or more, as its FPC license was due to expire in 1971 while PASNY's bonds were not likely to mature until after the year 2000.[6] This agreement was memorialized in a September 19, 1956, amendment to the application PASNY had pending before the FPC for a license to construct a power project on the Niagara River. *See* Item 43, Exh. 33.[7] Shortly thereafter, this compromise was incorporated into House and Senate bills which, with minimal additional wrangling, became the NRA. *See* House Report, *supra*, at 6 (discussing compromise).

Once the NRA was passed, on January 30, 1958, the FPC issued a license to PASNY. 19 F.P.C. 186. This license incorporated verbatim the entire text of the NRA. *Id.* at 193–95. The license was dated September 1, 1957, and made effective for fifty years. PASNY completed construction on and began operation of the Niagara project in 1961.

After completing the hydroelectric project, in February, 1961, PASNY entered into a contract—Contract NS–1—to sell 1,190,000 kW of power to Niagara Mohawk for resale to its customers. Of this allocation, 445,000 kW was designated as Re-

placement Power to be sold in accordance with the NRA to industrial customers within thirty miles of PASNY's Niagara switchyard. Item 44, Exh. 61, Part Two, Art. VI [hereinafter Contract NS–1]. PASNY specifically reserved the right within this contract to modify rates charged to Niagara Mohawk for Replacement Power.

> The rate schedules specified in this contract shall be subject to successive modification by the Authority through the promulgation of superseding rate schedules.

Contract NS–1, *supra*, General Power Contract Provisions, Part E at 24.

PASNY set the initial price for Replacement Power in 1961 at an average cost to industry of less than one-half cent per kWh (4.38 mills). Contract NS–1, *supra*, Schedule NP–F1. This rate remained constant until 1990. Plaintiffs receive this power pursuant to resale contracts with Niagara Mohawk at a price equal to Niagara Mohawk's cost plus a transmission and delivery charge. *See* Contract NS–1, *supra*, Exh. B. On September 26, 1989, PASNY filed notice of its first proposed increase in Replacement Power rates since 1961. Item 44, Exh. 78, ¶ 31. At that point:

> The President of PASNY, in a memorandum placed before the Trustees on that date, opined that although the price for Replacement Power "should, at a minimum, recover the cost of service, [it] need not be limited to that level." *See* [GM] Item 9, Exh. 5, at 16. The President also commented that additional revenue from sale of Replacement Power, if not needed under the terms of the "Gen-

---

**6.** During oral argument, plaintiffs' counsel stated another reason why Niagara Mohawk was eager to make this arrangement with PASNY. By gaining longer-term access to 445,000 kW of hydroelectric power for industry, Niagara Mohawk could solidify the industrial base, and thus the overall market for electricity, in the Niagara region. Niagara Mohawk could then take advantage of this market through sales from other electricity sources. *See* Item 53 at 63–64.

**7.** Frustrated by the delay in gaining a bill in Congress, PASNY elected in 1956 to pursue Niagara development directly by applying for a license from the FPC. PASNY's legal advisors

felt that the reservation attached by the Senate to the 1950 Treaty was merely advisory, and did not preclude an applicant from obtaining a license even without congressional authorization. In early 1957, the Court of Appeals for the District of Columbia Circuit so held. *Power Auth. of the State of New York v. Federal Power Comm'n,* 247 F.2d 538, 544 (D.C.Cir.), *vacated, American Public Power Ass'n v. Power Auth. of the State of New York,* 355 U.S. 64, 78 S.Ct. 141, 2 L.Ed.2d 107 (1957) (vacated after passage of NRA). Until its agreement with Niagara Mohawk, however, PASNY did not seek in its application to use the water allocated to Niagara Mohawk prior to the 1950 Treaty.

eral Purpose Bond Resolution," could be used "for any lawful corporate purpose," including "funding the Authority's capital program, such as timely completion of the Niagara Expansion Project, or the advance retirement of debt." *Id.*

After public comment and response, *see generally* [GM] Item 9, Exh. 5, Richard M. Flynn, Chairman of PASNY, submitted a report to the Trustees on December 21, 1989, *id.* at 1–12, in which he recommended PASNY approve proposed price increases for 1990 and 1991 and defer decision on proposed increases for 1992–1997. *Id.* at 1. The Trustees adopted the Chairman's recommendations.

*OCC v. PASNY,* 758 F.Supp. at 857 (footnote omitted). New Replacement Power rates were implemented in 1990, 1991 and 1992.[8]

## DISCUSSION

■ The issue before the court is whether § 836(b)(3) of the NRA requires PASNY to sell Replacement Power at its cost of producing that power. In interpreting the NRA, the court must begin by looking closely at the language of the statute. *E.g., Mallard v. United States Dist. Court,* 490 U.S. 296, 300, 109 S.Ct. 1814, 1817, 104 L.Ed.2d 318 (1989); *United States v. Ron Pair Enter.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *Samuels, Kramer & Co. v. Commissioner,* 930 F.2d 975, 979 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 416, 116 L.Ed.2d 436 (1991). Where the statutory language is clear and unambiguous, that ends the court's inquiry. *Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482, 83 L.Ed.2d 472 (1984); *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20, 22 (2d Cir.1989); *Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 62–63 (2d Cir.1985). If the statute is unclear, only then may the court turn to legislative history. *Garcia,* 469 U.S. at 75, 105 S.Ct. at 482; *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984).

Turning to the text of the NRA, the first section directed the FPC, now named FERC, to issue a license to PASNY to develop a hydroelectric power project on the Niagara River utilizing all of the water allocated to the United States under the 1950 Treaty. 16 U.S.C. § 836(a). The FPC was instructed to include within this license seven conditions governing the distribution and sale of power generated by the project. 16 U.S.C. § 836(b). *See supra* (discussing conditions). This court must interpret the meaning of the third of these seven conditions. The entire text of that condition is as follows:

The licensee [PASNY] shall contract, with the approval of the Governor of the State of New York, pursuant to the procedure established by New York law, to sell to the licensee of Federal Energy Regulatory Commission ("FERC") project 16 [Niagara Mohawk] for a period ending not later than the final maturity date of the bonds initially issued to finance the project works herein specifically authorized, four hundred and forty-five thousand kilowatts of the remaining project power, which is equivalent to the amount produced by project 16 prior to June 7, 1956, for resale generally to the industries which purchased power produced by project 16 prior to such date, or their successors, *in order as nearly as possible to restore low power costs to such industries* and for the same general purposes for which power from project 16 was utilized: *Provided,* That the licensee of project 16 consents to the surrender of its license at the completion of the construction of such project works upon terms agreed to by both licensees and approved by the Federal Energy Regulatory Commission which shall include the following: (a) the licensee of project 16 shall waive and release any claim for compensation or damages from the Power Authority of the State of New York or from the State of New York, except just compensation for tangible property and rights-of-way actually taken, and (b) without limiting the generality of the

---

**8.** *See id.* at 857 n. 6. The 1992 rate is just over one cent per kWh. Item 48 at 5 n. 1.

foregoing, the licensee of project 16 shall waive all claims to compensation or damages based upon loss of or damage to riparian rights, diversionary rights, or other rights relating to the diversion or use of water, whether founded on legislative grant or otherwise.

16 U.S.C. § 836(b)(3) (emphasis added and in original).

Reviewing this language from the beginning, the subsection states that PASNY "shall contract, with the approval of the Governor of the State of New York, pursuant to the procedure established by New York law" to sell to Niagara Mohawk "for a period ending not later than the final maturity date of the bonds initially issued to finance the project works," 445,000 kW of project power "which is equivalent to the amount produced by project 16 prior to June 7, 1956...." *Id.* The power sold to Niagara Mohawk, in turn, was designated for resale "generally to the industries which purchased power produced by project 16 prior" to June 7, 1956, "or their successors...." *Id.* There is no dispute as to the meaning of this language.

■ There are, however, two important points about the statute to this point. First, § 836(b)(3) required PASNY to contract with Niagara Mohawk for a period "ending not *later* than" the final maturity date of the bonds PASNY would issue to finance the project. *Id.* (emphasis added). Congress did not require PASNY to sell Replacement Power for a period ending not *earlier* than the final maturity date of PASNY's bonds. Thus, Congress did not contemplate that the 445,000 kW of project power reserved for the industries serviced by Niagara Mohawk would be available for an indefinite time. Once the maturity date on the initial PASNY bonds is reached in 2006, it is clear from the face of the statute that Replacement Power as a category of Niagara project power will cease to exist. Further, by specifying that PASNY "shall contract" for a period "ending not *later* than" the maturity date on the bonds, the statute contemplates that PASNY and Niagara Mohawk could have agreed to contract for a shorter period. Second, the

language requiring PASNY to contract with Niagara Mohawk to sell it Replacement Power was triggered only if Niagara Mohawk met the conditions of a proviso, set forth in the second half of § 836(b)(3), under which Niagara Mohawk would agree to relinquish its FPC license and any other rights it may have held to Niagara water at the time the NRA was passed. *Id.* As the Senate Report accompanying the NRA stated:

It is not the intention of the committee, however, to require that the capacity reserved for the Niagara–Mohawk Power Corp., be held in reserve for an indefinite period. If, for some reason the corporation declines to accept the amount of capacity specified, then the Power Authority of the State of New York should be free to dispose of the capacity to other users.

S.Rep. No. 539, 85th Cong., 1st Sess. 8 ("Senate Report") (Item 42, Exh. 5).

The critical language from § 836(b)(3), however, is found in the center of the subsection. Read in context, it provides that PASNY "shall contract" with Niagara Mohawk to sell 445,000 kW of project power for resale to the industries which purchased Project 16 power prior to June 7, 1956,

*in order as nearly as possible to restore low power costs to such industries* and for the same general purposes for which power from project 16 was utilized....

16 U.S.C. § 836(b)(3) (emphasis added). It is this language, and specifically the phrase "in order as nearly as possible to restore low power costs," that plaintiffs latch on to in an effort to prove that Congress required PASNY to sell Replacement Power at cost. Plaintiffs argue as follows.

First, plaintiffs look to the phrase "restore low power costs" from § 836(b)(3) and argue that what Congress intended PASNY to "restore" was the low cost of hydroelectric power enjoyed by Niagara area industries from Project 16. For a considerable number of industries in the Niagara region, Project 16 power was sold by Niagara Mohawk prior to the 1956 rock slide for approximately three mills per

kWh. This fact is not in dispute.[9] It is also not in dispute that this rate was put into place by 1915 and was not changed for more than forty years thereafter. Thus, there is no question that many Niagara Falls industries, including plaintiffs in this case, enjoyed low power costs from Project 16 prior to the rock slide. Plaintiffs then note that the loss of this inexpensive power was of great concern to Congress. Lawmakers feared that the loss of this low cost power, upon which many local industries were deeply dependent, would have a disastrous effect on the economy of the area.[10] Congress understood that replacement and augmentation of this low-cost power, on the other hand, would permit these industries to expand.[11] Given these congressional concerns, plaintiffs argue that Congress designed the NRA to require PASNY to restore the low power costs charged to them by Niagara Mohawk prior to the destruction of the Schoellkopf Station.

Second, plaintiffs focus on the word "restore" and argue, based on Webster's dictionary, that "restore" means to "to bring back into existence or use," or "to bring back to an original state." *Webster's II New Riverside University Dictionary* (1984). This argument essentially repeats the first argument—that Congress intend-

ed to "restore" the low three mill rate industries enjoyed prior to the rock slide—albeit with a slightly different emphasis. Plaintiffs point out that the three mill rate charged some industries receiving power from Project 16 was based on Niagara Mohawk's expenses associated with that project, not with other more expensive power-generating facilities it owned. Plaintiffs also point out that the principal expense in generating hydroelectric power is the cost of debt service associated with the initial construction of the hydroelectric facility. Niagara Mohawk was able to sell a substantial portion of Project 16 power at the three mill rate for more than forty years because it built the Project 16 plants at the turn of the century and its expenses remained stable throughout this period. Finally, plaintiffs point out that the industries which had located in this region to take advantage of these low rates testified before Congress of their concern that electricity costs remain stable over a long period so they could plan for the future.[12] From these premises, plaintiffs then leap to the conclusion that

> by "restore low power costs," Congress meant to reinstate for an extended period power costs which had been character-

9. Approximately 273,000 kW of Project 16 power was sold at the three mill rate. *See* Item 47 at 4–5.

10. As the House report stated under the heading "EMERGENCY NEED FOR PROMPT LEGISLATION:"

> When [the rockslide] disaster occurred to the Schoellkopf powerplant of Niagara Mohawk Power Corp., the plant had a capacity of some 365,000 kilowatts of firm hydroelectric power. The operations of huge concentrations of electrometallurgical and electrochemical industries at Niagara Falls depend in substantial part upon this capacity. These operations constitute the principal sources of employment on the Niagara frontier and comprise the heart of the economy of the area. They are vital to the national defense. Substitute power, largely imported from Canada on a temporary basis, is much more costly.
>
> House Report, *supra*, at 2.

11. Representative Blatnik, floor manager of the House bill, commented during floor debate: "They [basic industries] cannot continue to stay at Niagara unless newly developed low-cost

power is made available. On the other hand, if it is again made available, they will remain and expand in the area." 103 Cong.Rec. 13,196 (1957) (Item 42, Exh. 4). *See also* Senate Report, *supra*, at 7 ("Many of the industries were originally attracted to the area because of low power costs which were lost to them when the catastrophe occurred. Therefore, the interest of the industries is to obtain replacement of the low cost power lost and to obtain additional power for expansion.").

12. Earle J. Machold, President of Niagara Mohawk, testified before the Senate:

> As has been said, these large industries in [the Niagara frontier] who use large amounts of power are rightfully concerned as to whether or not that cheap power is going to be or can be restored, and if so on how permanent a basis so they can make their plans for the future.

*Development of Power as Niagara Falls, N.Y.: Hearings on S. 512 and S. 1037 Before the Subcomm. on Flood Control and Harbors—of the Senate Comm. on Public Works*, 85th Cong., 1st Sess. 184 (April 10–13, 1957) ("1957 Senate Hearings") (Item 42, Exh. 6).

ized by their long term stability and priced solely by reference to the cost of production at the Project 16 power generation facilities.

Item 37 at 16.

Third, plaintiffs accept that Congress could not have intended for PASNY *literally* to restore the three-mill rate charged to Project 16 customers because it understood, based on testimony before Congress that, given the costs of new construction, PASNY could not duplicate this low rate.[13] Realizing the three mill rate could not be met, Congress called for PASNY *"as nearly as possible* to restore low power costs...."* 16 U.S.C. § 836(b)(3) (emphasis added). Plaintiffs argue that when this phrase is considered in the context of PASNY's representations to Congress—that it could sell the power more cheaply than if a private utility were to build the project—it indicates that Congress understood that PASNY could most closely approximate the old Project 16 rates. PASNY cited three reasons why it could develop the project more cheaply: (1) it was exempt from state and federal taxes; (2) it could finance new construction less expensively through the sale of tax exempt bonds;[14] and (3) as a nonprofit agency, it would not need to offer shareholders a rate of return on their investment. Plaintiffs then extrapolate from these representations the conclusion that Congress intended by the phrase "as nearly as possible to restore low power costs" to require PASNY to sell Replacement Power at cost.

Plaintiffs' reading of the statute appears to the court to be quite contrived. The words chosen by Congress simply do not support the meaning ascribed to them by plaintiffs. Let us proceed step by step.

Beginning as we must with the language of the statute, *see, e.g., Mallard,* 490 U.S. at 300, 109 S.Ct. at 1817; *Ron Pair Enterprises,* 489 U.S. at 241, 109 S.Ct. at 1030;

---

**13.** An exchange between Earle Machold and Senator Carroll during Senate hearings was as follows:

> Senator Carroll: Was your output prior to the rockslide to be taken care of by the 445,000 kilowatts?
> Mr. Machold: Just a replacement.
> Senator Carroll: Is it anticipated that that replacement will permit you to sell power at about the same rate or at a higher rate?
> Mr. Machold: I doubt it will be at the same rate. It will be at a higher rate. How much higher I can't tell you. I think it would be in excess of probably 4 mills.

1957 Senate Hearings, *supra,* at 187 (Item 42, Exh. 6). Robert Moses, Chairman of PASNY, in a letter to Senator Clark included in the record of those hearings, estimated that "Niagara power will cost a high load factor customer about 3½ to 4 mills at the bus bar." *Id.* at 84. This estimate was echoed by Representative William A. Miller, sponsor of parallel legislation in the House, during the same hearings. *Id.* at 26.

**14.** An exchange between Representative Scherer and Mr. Moore, General Counsel of PASNY, during House hearings, went as follows:

> Mr. Scherer: Does the New York Power Authority pay any taxes to the Federal Government?
> Mr. Moore: It does not, sir.
> Mr. Scherer: If it develops this power will it pay any taxes to the Federal Government?
> Mr. Moore: Under the law as it stands now it will not.
> Mr. Scherer: Will it pay any taxes to the State of New York?

> Mr. Moore: Under the law as it stands now it will not, sir.
> Mr. Scherer: Will it pay any amounts for water usage?
> Mr. Moore: As the law is now it will not, sir.
> Mr. Scherer: Is that not the reason why you can pass economies on to the consumer?
> Mr. Moore: Is that the reason? That is one of the reasons. It is not the only reason.
> Mr. Scherer: It is just about the principal reason.
> Mr. Moore: No. Another reason is that we can borrow money cheaper. There is a big difference in operation there as far as the consumer is concerned. You take $400 million. The power companies put in $10 million and borrow the other $390 million at 3½ percent, and they will get 6 percent on the $390 million all through the years.
>    The power authority will borrow the same money for less than 3 percent, and all the consumers will pay for is what the power authority pays out, which is less than 3 percent. It is a big and tremendous difference there.

*Niagara Power: Hearing on S. 1823 and H.R. 11477 Before the House Comm. on Public Works,* 84th Cong., 2d Sess. 36–37 (1956) ("1956 House Hearings") (Item 42, Exh. 7). It must be noted that these hearings were before a different Congress than that which passed the NRA. In 1957, the NRA was whisked through the House committee without hearings or debate right to the House floor.

*Samuels, Kramer & Co.*, 930 F.2d at 979, the NRA directs PASNY to sell Replacement Power to Niagara Mohawk for resale to local industry "in order as nearly as possible to *restore low power costs to such industries....*" 16 U.S.C. § 836(b)(3) (emphasis added). Plaintiffs would have this court interpret this phrase as requiring PASNY to sell Replacement Power "at cost" or "at PASNY's cost of production." Congress, however, did not use the phrase "at cost" or any similar phrase in the NRA. The word "costs" in § 836(b)(3) refers to *industries'* costs, not PASNY's. There is no reference whatsoever in the NRA, nor in the legislative history, which discusses *PASNY's* "costs" in setting a rate for Replacement Power.

Section 836(b)(3) also does not use the word "rate." This word is used only in § 836(b)(1), which gives public bodies and nonprofit cooperatives preference to power for the benefit of consumers, "to whom such power shall be made available at the lowest rates reasonably possible...." 16 U.S.C. § 836(b)(1).

The words "cost" and "rate" were, however, critical to Congress when it drafted contemporaneous statutes to establish cost-based rates for government-sponsored hydroelectric power projects. At the time Congress passed the NRA, it had recently passed legislation authorizing the disposition of electricity generated at Falcon Dam on the Rio Grande. This statute specifically provided for a cost-based determination of electricity rates by directing the Department of the Interior to:

> [T]ransmit and dispose of such power and energy ... *at the lowest possible rates* to consumers consistent with sound business principles.... *Rate schedules shall be drawn having regard to the recovery ... of the cost of producing and transmitting such electric energy,* including the amortization of the capital investment allocated to power ... over a reasonable period of years.

Falcon Dam on the Rio Grande, ch. 310, 68 Stat. 255 (1954) (emphasis added) ("Falcon Dam Act"). Nearly identical language was used in section 5 of the Flood Control Act of 1944. 16 U.S.C. § 825s. This language set the kind of cost-based standard that plaintiffs seek to impose on the NRA. *See United States v. Tex–La Elec. Coop., Inc.*, 693 F.2d 392, 394 (5th Cir.1982); *Associated Elec. Coop., Inc. v. Morton*, 507 F.2d 1167, 1173–74 (D.C.Cir.1974), *cert. denied,* 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47 (1975). Congress was fully aware of this language when it adopted the NRA. *See* House Report, *supra,* at 2, 7–8 (noting section 5 of the Flood Control Act). *See also Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 184–85, 108 S.Ct. 1704, 1711–12, 100 L.Ed.2d 158 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts."); *Bonanno,* 879 F.2d at 25. This language was not used in § 836(b)(3) of the NRA, however.[15] Had Congress intended to require PASNY to sell Replacement Power at cost, it could easily have said so in unequivocal language. *See PASNY v. FERC,* 743 F.2d at 104 (interpreting § 836(b)(1) of the NRA: "If Congress had wanted to restrict resale to domestic and rural consumers it could easily have done so simply by stating that the power was to be made available to public bodies 'for resale only' to such consumers."). *See also West Virginia Univ. Hosp. v. Casey,* ——

---

**15.** Language even more detailed than that used in the Falcon Dam Act and the Flood Control Act was used in the statute establishing the Tennessee Valley Authority ("TVA"), which was passed in 1959, just two years after enactment of the NRA. That statute provided:

> The Corporation shall charge rates for power which will produce gross revenues sufficient to provide funds for operation, maintenance, and administration of its power system; payments to States and counties in lieu of taxes; debt service on outstanding bonds, including provision and maintenance of reserve funds and other funds established in connection therewith; payments to the Treasury as a return on the appropriation investment ... and such additional margin as the Board may consider desirable for investment in power system assets, retirement of outstanding bonds in advance of maturity, additional reduction of appropriation investment, and other purposes connected with the Corporation's power business, having due regard for the ... objective that power shall be sold at rates as low as are feasible.

16 U.S.C. § 831n–4(f).

U.S. ——, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991) ("Congress could easily have shifted 'attorney's fees and expert witness fees,' or 'reasonable litigation expenses,' as it did in contemporaneous statutes; it chose instead to enact more restrictive language, and we are bound by that restriction."); *Regan v. Wald*, 468 U.S. 222, 235–36, 104 S.Ct. 3026, 3034, 82 L.Ed.2d 171 (1984) ("If Congress had wished to freeze existing restrictions, it could easily have done so explicitly."). Congress did not do so.

The phrase "restore low power costs" also cannot mean "sell at cost" or "restore power sold at cost" by plaintiffs' own analysis. Plaintiffs' main argument is that the phrase "low power costs" in § 836(b)(3) was understood by Congress to refer to the three mill rate charged to high-load industrial customers of Project 16. Plaintiffs readily admit that, prior to the rock slide, Niagara Mohawk provided these industries with "low power costs." What plaintiffs fail to point out, however, is that even though the three-mill rate charged by Niagara Mohawk was very low, and had not been changed for some customers for more than forty years, it was *never* sold by Niagara Mohawk "at cost." Niagara Mo-

hawk, as a private utility, set the rates for each category of Project 16 power so that it would reap a profit on that sale. Indeed, it appears that Niagara Mohawk's "cost" of production of Project 16 power was approximately one-and-one-half mills, or roughly fifty percent of the rate it charged industrial customers.[16] Thus, Congress, which was well aware of these facts when it drafted the NRA, could not have meant by the phrase "restore low power costs to such industries" to require PASNY to sell Replacement Power "at cost," because industries in the Niagara region had never received Project 16 power "at cost."[17] At most the phrase requiring PASNY to sell Replacement Power to Niagara Mohawk for resale "in order as nearly as possible to restore low power costs to such industries" meant that PASNY should provide low-cost power to these industries.[18] The phrase "low power costs" means what it says: low-cost power. It does not mean "at cost" power.

PASNY was capable of supplying lower cost power to industry than a private developer could because, as noted above, it (1) was exempt from state and federal taxes; (2) could finance new construction more economically through sale of tax exempt

---

**16.** During 1955 Senate hearings, Earle Machold of Niagara Mohawk had the following exchange with Senator Kerr, the Senator who fashioned the compromise that became the NRA:

> Senator Kerr: Roughly, what does it cost to produce that [Project 16] power?
>
> .   .   .   .   .
>
> Mr. Machold: I am advised by my associate that, including fixed charges, taxes, *return*, and depreciation, it costs about 3 mills to produce that power.
> Senator Kerr: If that is true, how is it that you sell industry the power at 3 mills?
> Mr. Machold: I am coming to that, sir. The production costs, which do not include depreciation, insurance, and *return on investment*, costs about a mill and a half to produce it.
> Senator Kerr: Is that over and about the rental?
> Mr. Machold: That includes the rental.
> Senator Kerr: What did you say?
> Mr. Machold: Including the rental.
> Senator Kerr: Then 3 mills covers cost of production, depreciation, fixed charges, taxes, and *return?*
> Mr. Machold: That is right.

*Niagara River Power Project: Hearings on S. 6 and S. 1823 Before a Subcomm. of the Senate*

*Comm. on Public Works*, 84th Cong., 1st Sess. 175–76 (1955) (emphasis added) ("1955 Senate Hearings") (Item 42, Exh. 8).

**17.** Further, although Niagara Mohawk chose not to do so, it was entitled to seek rate increases for Project 16 power before the NYPSC.

**18.** In *Airco Alloys Div., Airco, Inc. v. Niagara Mohawk Power Corp.*, 65 A.D.2d 378, 411 N.Y.S.2d 460 (1978), the Fourth Department of the New York State Appellate Division was called upon to interpret the contract between PASNY and Niagara Mohawk—Contract NS–1—which was authorized under § 836(b)(3) of the NRA. The court opined that the language of § 836(b)(3) "accorded [plaintiffs] nothing more than *a mere expectation* that low-cost power would again become available, and any enforcible [sic] rights to that power were granted only by Contract NS–1." *Id.* 411 N.Y.S.2d at 465 (emphasis added). In Contract NS–1, PASNY expressly reserved the right to modify the rates for Replacement Power. Contract NS–1, *supra*, General Power Contract Provisions, Part E ("The rate schedules specified in this contract shall be subject to successive modification by the Authority....").

bonds; and (3) did not pay stockholders a rate of return on their investment. But, contrary to plaintiffs' claims, PASNY was not required to market power sold to industry "at cost." PASNY's enabling statute, N.Y.Pub.Auth.Law § 1000 *et seq.* (McKinney's 1982), which was in place well in advance of the NRA, specifically empowered the Authority:

> To develop, maintain, manage and operate those parts of the Niagara and Saint Lawrence hydroelectric projects owned or controlled by it ... that in the development of hydroelectric power therefrom such projects shall be considered primarily as for the benefit of the people of the state as a whole and particularly the domestic and rural consumers to whom the power can economically be made available, *and accordingly that sale to and use by industry shall be a secondary purpose, to be utilized principally to secure a sufficiently high load factor and revenue returns to permit domestic and rural use at the lowest possible rates....*

*Id.* at § 1005(5) (emphasis added). Although this statute requires PASNY to charge a cost-based rate for hydroelectric power sold to domestic and rural consumers, it specifically permits higher-than-cost rates to be charged industry, with any excess to be transferred to PASNY's general fund. *Auer v. Dyson*, 110 Misc.2d 943, 444 N.Y.S.2d 513, 517–18 (N.Y.Sup.Ct.1981). *See also Auer v. Dyson*, 125 Misc.2d 274, 479 N.Y.S.2d 102, 104 (N.Y.Sup.Ct.1984), *aff'd*, 112 A.D.2d 803, 491 N.Y.S.2d 1022 (1985). This specific provision was brought to the attention of Senators Javits and Ives, key supporters of the NRA, in a letter dated July 5, 1957, by Louis K. Lefkowitz, Attorney General of New York. *See* Item 39, Exh. B at 10–11.[19] There is no evidence that Congress intended to supersede the plain terms of this New York statute.

It is also important to look at *all* of § 836(b)(3) when investigating the meaning of the particular phrase plaintiffs focus on. As mentioned previously, § 836(b)(3), strictly speaking, did not *require* PASNY to sell 445,000 kW of project power to Niagara Mohawk *at all*. The arrangement under which PASNY would contract with Niagara Mohawk for the sale of 445,000 kW of project power was contingent on the proviso that Niagara Mohawk be willing to surrender its FPC license and any other claims to Niagara water it may have had, plus any claims for compensation and/or damages associated therewith. The Senate report accompanying the NRA stated that should Niagara Mohawk for any reason not agree to the arrangement, PASNY was free to market Niagara project power to whomever it chose. *See supra.* The statute also specified that the Replacement Power contract between PASNY and Niagara Mohawk, if it were consummated, should be "for a period *ending not later than* the final maturity date of the bonds initially issued to finance the project...." 16 U.S.C. § 836(b)(3) (emphasis added). This language, which is not in dispute, indicates that Congress was concerned with the immediate crisis facing industry in the late 1950s and early 1960s. There is no indication from the statute that Congress intended that the rates for Replacement Power be fixed at their 1961 level, the year the NRA facilities were completed, indefinitely into the future.

Accordingly, based solely on an analysis of the statutory language, the court finds that the NRA does not require a cost-based rate for Replacement Power.

This conclusion squares with contemporaneous statutes discussed above which granted preference to power from public projects to "public bodies and cooperatives," and which reserved the "lowest possible rates" for *"consumers,"* not industry. *See* Falcon Dam Act, *supra,* at 256; Flood Control Act, 16 U.S.C. 825s (emphasis added). This same bias is reflected in § 836(b)(1) of the NRA. Plaintiffs, on the

---

**19.** Several Congressmen mentioned during floor debate that the NRA was consistent with the New York Public Authorities Law. *See* 103 Cong.Rec. 14,438 (1957) (remarks of Senator Chavez); *id.* at 14,442 (remarks of Senator Javits); 103 Cong.Rec. 13,203 (1957) (remarks of Representative Dooley).

other hand, can point to no other federal statute which has granted industry an at-cost preference to public hydroelectric power. *See West Virginia Univ. Hosp.*, 111 S.Ct. at 1147 (finding record of statutory usage important in determining whether federal statute's use of phrase "attorney's fee" included separately-billed expenses for law clerks and paralegals).

■■■■ This conclusion also squares with the legislative history of the NRA. Before launching into an analysis of the legislative history, however, the court notes that "we do so with the recognition that only the most extraordinary showing of contrary intentions from those data would justify a limitation on the 'plain meaning' of the statutory language." *Garcia*, 469 U.S. at 75, 105 S.Ct. at 482. *See also North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983); *United States v. Hescorp, Heavy Equip. Sales Corp.*, 801 F.2d 70, 75–76 (2d Cir.), *cert. denied*, 479 U.S. 1018, 107 S.Ct. 672, 93 L.Ed.2d 723 (1986); *Friends of the Earth*, 768 F.2d at 62–63. Further, not all sources of legislative history are entitled to equal consideration. The Supreme Court has "repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill...." *Garcia*, 469 U.S. at 76, 105 S.Ct. at 483 (citing *Zuber v. Allen*, 396 U.S. 168, 186, 90 S.Ct. 314, 324, 24 L.Ed.2d 345 (1969)). *See also In re Kelly*, 841 F.2d 908, 912 n. 3 (9th Cir.1988). The comments of a single legislator are entitled to significantly less weight. *Garcia*, 469 U.S. at 76, 105 S.Ct. at 483; *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980); *Murphy v. Empire of Am.*, 746 F.2d 931, 935 (2d Cir.1984). If such comments are made by a legislator *after* a bill's passage, they are entitled to almost no weight. *Bread Political Action Comm. v. Federal Election Comm'n*, 455 U.S. 577, 582 n. 3, 102 S.Ct. 1235, 1238 n. 3, 71 L.Ed.2d 432 (1982); *Consumer Prod. Safety Comm'n*, 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13; *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974); *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1475 (9th Cir.1987). Importantly, no significance should be accorded statements made by interested *witnesses* at congressional hearings, especially if these are not included in House or Senate reports. *Kelly v. Robinson*, 479 U.S. 36, 51 n. 13, 107 S.Ct. 353, 361–62 n. 13, 93 L.Ed.2d 216 (1986); *Regan v. Wald*, 468 U.S. at 237, 104 S.Ct. at 3035; *McCaughn v. Hershey Chocolate Co.*, 283 U.S. 488, 493–494, 51 S.Ct. 510, 512, 75 L.Ed. 1183 (1931); *T.B. Harms Co. v. Jem Records, Inc.*, 655 F.Supp. 1575, 1581 (D.N.J.1987); *Harry Fox Agency v. Mills Music, Inc.*, 543 F.Supp. 844, 864–65 (S.D.N.Y.1982), *rev'd*, 720 F.2d 733 (2d Cir. 1983), *rev'd sub nom., Mills Music, Inc. v. Snyder*, 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985). 2A N. Singer, *Sutherland on Statutory Construction* § 48.10 at 343 & n. 15 (5th ed.1992).

With these considerations in mind, the court searches in vain for any statement in the legislative history by a member of Congress which expressed an understanding that the NRA required PASNY to sell Replacement Power at cost.[20] The committee

---

**20.** The lone exchange cited by plaintiffs took place between Senator Carroll and Thomas F. Moore, Jr., PASNY's General Counsel, during the 1957 Senate Hearings. That exchange went as follows:

> Senator Carroll: What would be the pay-out period on the project?
> Mr. Moore: The actual pay-out period will be 35 years. The long term will be a little longer because of that amortization provision in the bonds.
> Senator Carroll: When the pay-out period is over, do the revenues go to the New York State Authority?

> Mr. Moore: No. Under the law that Senator Javits told you about, that established the power authority, *the power authority is mandated to sell power at cost. That is all. We don't make any profit. Nobody makes any profit.* And it will continue to be sold as long as we are in business.
> Senator Carroll: That is a very important point. I didn't understand that.

1957 Senate Hearings, *supra*, at 175 (emphasis added).

This statement, however, coming as it does from a witness, is completely without value in determining Congress's intent behind the NRA. *See, e.g., Kelly*, 479 U.S. at 51 n. 13, 107 S.Ct. at

reports are replete with statements similar to the following: "Practically everyone was in agreement that restoration of low-cost power to the industries in the Niagara area is desirable." Senate Report, *supra*, at 7. *See also supra* notes 10–11 and accompanying text (discussing congressional concerns over restoration of low-cost power). Congress was concerned because the loss of inexpensive Project 16 power, which forced industries to scramble for much more expensive and less reliable Canadian power, posed the threat that if inexpensive power did not again become available, industries would leave the Niagara region, with devastating effect on the local economy. *See* Senate Report, *supra*, at 7–8; House Report, *supra*, at 2, 8. But these concerns, expressed in the requirement that PASNY "restore low power costs to such industries," cannot be reasonably read to require PASNY to sell Replacement Power at cost.

Were this Congress's intent, presumably there would have been some discussion of the factors that might be considered part of PASNY's "costs" in selling Replacement Power. *Compare* 16 U.S.C. § 825s (Flood Control Act); § 831n–4(f) (TVA statute); ch. 310, 68 Stat. 255 (Falcon Dam Act). Yet there is not a word of discussion in the legislative history of rate formulas, or the items that might go into a determination of PASNY's "costs" in selling Replacement Power.[21]

To this court it is clear that Congress's main concern in providing low-cost power to industry in the Niagara region was to avoid economic dislocation should such industry be forced to move their operations in search of lower-cost power. This concern has been satisfied.[22] Industry has not moved from the Niagara region because, even with the higher rates so far implemented by PASNY,[23] Replacement Power is still apparently the cheapest firm industrial power in the United States, and by a wide margin.[24] Until Replacement Power rates were increased for the first time in January, 1990, the effects of inflation had steadily diminished the cost to industry of Replacement Power. At the end of 1989, Replacement Power cost industry just thirty-five percent in real terms of what it cost industry in 1961. *See* Item 39, ¶ 61. Meanwhile, other industrial rates charged Niagara area industries continued to increase, such that even at the 1992 rate of approximately one cent per kWh, Replacement Power cost less than one-sixth the rate charged to Niagara Mohawk's other industrial customers in the Niagara area. *Id.*

361–62 n. 13; *McCaughn*, 283 U.S. at 493–94, 51 S.Ct. at 512. Moreover, just prior to this quotation, Senator Carroll and Mr. Moore are discussing the *St. Lawrence* project, not the Niagara project. Mr. Moore's reference to "the bonds" appears to refer to the former project, for which bonds had already been issued; the bonds for the Niagara project would not be issued for some time. Thus, it is not at all clear that the parties are even discussing the Niagara project. Finally, if the highlighted statement is understood to mean more than that PASNY does not pay a rate of return to private investors, and thus makes no "profit," it is simply false. For many classes of power sold by PASNY, e.g., Expansion Power, even plaintiffs admit this power need not be marketed "at cost." *See* N.Y.Pub.Auth.Law § 1005(5); *Auer v. Dyson*, 444 N.Y.S.2d at 517–18.

21. By contrast, PASNY's enabling statute sets forth the elements which may be included in setting its cost-based rate for domestic and rural consumers. N.Y.Pub.Auth.Law § 1005(5). *See Auer v. Dyson*, 444 N.Y.S.2d at 518 n. 6. This statute was in place at the time the NRA was enacted.

22. Congress was also interested, as mentioned above, *see supra* note 11 and accompanying text, in encouraging expansion of industry in the Niagara region. Permitting PASNY to raise industrial rates to help fund additional power-generating projects would seem to further that goal.

23. The 1991 rate for Replacement Power was approximately 9 mills, or less than one cent per kWh. In 1992 this rate increased to just over one cent per kWh. *See* Item 39, ¶ 60; Item 48 at 5 n. 1.

24. The record is not complete in this regard because discovery was not completed prior to the filing of the present motions. Nevertheless, plaintiffs have admitted that " '1991 Replacement Power rates are priced below virtually all rates for firm power sold to industrial customers in service territories in geographic areas of the United States....' " Item 39, ¶ 62 (quoting plaintiffs' response to defendant's first set of interrogatories).

Accordingly, from an analysis of the statute and the legislative history, the court holds that the NRA does not mandate a cost-based rate for Replacement Power.

█ Plaintiffs seek to avoid this conclusion by citing statements made by PASNY to the FPC, the Governor of New York, and other parties *after* enactment of the NRA which they contend restrict PASNY to a cost-based Replacement Power rate. *See, e.g.,* Item 37 at 20–33. The post-enactment statements of PASNY representatives, however, have no relevance in determining *congressional* intent. *See, e.g., Bread Political Action Comm.,* 455 U.S. at 582 n. 3, 102 S.Ct. at 1238 n. 3; *Consumer Product Safety Comm'n,* 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13; *Regional Rail Reorganization Act Cases,* 419 U.S. at 132, 95 S.Ct. at 353; *Cook Inlet Native Ass'n,* 810 F.2d at 1475.[25] This court must decide what Congress meant when it enacted the NRA, not what PASNY may have thought Congress meant several years later.[26] Moreover, under the NRA, PASNY is a mere *licensee.* As a licensee, it does not have the same authority, as federal agencies often do, to interpret the statute. *See, e.g., Rust v. Sullivan,* ── U.S. ──, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 83, 101 S.Ct. 295, 306, 66 L.Ed.2d 268 (1980).[27] Therefore, this court need not accord great deference to PASNY's interpretation of the NRA.[28]

**25.** Plaintiffs do not argue at this point that PASNY is bound under a theory of promissory estoppel to alleged promises it made with respect to the NRA. Even if they did, this theory has been rejected by the New York State Appellate Division. *See Advanced Refractory Technologies, Inc. v. Power Auth. of the State of New York,* 171 A.D.2d 1031, 568 N.Y.S.2d 986, 987, *appeal dismissed,* 78 N.Y.2d 949, 573 N.Y.S.2d 642, 578 N.E.2d 440 (1991) ("Absent an unusual factual situation, not present here, estoppel is not available against a governmental agency exercising its governmental function."). *See also United States v. Boccanfuso,* 882 F.2d 666, 670 (2d Cir.1989); *United States v. Schmitt,* 734 F.Supp. 1035, 1055 (E.D.N.Y.1990). Rather, plaintiffs assert that PASNY's contemporaneous interpretations of the NRA should be given substantial weight. For the reasons stated in the text and in footnote 26, the court finds this argument to be without merit.

**26.** Plaintiffs chiefly rely on language in *PASNY v. FERC,* 743 F.2d at 106, to rebut these conclusions. In that case, the Second Circuit, reviewing the preference language of § 836(b)(1) of the NRA, held that according to the plain language of the statute there was no "end-use" restriction on the resale of power sold to preference customers. *Id.* at 104. The court noted that absent the clearest expression of congressional intent to the contrary, this plain language must govern. *Id.* at 103. The court held that there was no contrary congressional intent. *Id.* at 105. The court then noted that PASNY, which took a contrary view in *PASNY v. FERC,* had taken a position in prior litigation and in statements by trustees consistent with the Second Circuit's reading of the plain statutory language. *Id.* at 105–06. The court concluded: "In light of this background, and the NRA's plain language and legislative history, PASNY's changed position [in the current case] is not entitled to any weight." *Id.* at 106.

Plaintiffs argue from this conclusion that, given various representations PASNY allegedly made prior to this litigation that Replacement Power must be sold at cost, its position in the present case should not be granted any weight. That may be. Plaintiffs' argument misses the mark, however, because even if this court accords *no* weight to PASNY's present position on the meaning of the NRA, that has no bearing on determining *Congress's* intent in drafting the NRA. In *PASNY v. FERC,* the Second Circuit did not in any way rely on statements made by PASNY to evidence *congressional* intent in enacting the NRA. The court merely stated that PASNY's waffling interpretation of the NRA undermined its then-current arguments.

**27.** Even if PASNY was considered analogous to the agencies in *Chevron* and *Rust,* it would then be entitled to change its interpretation of the NRA. *Rust,* 111 S.Ct. at 1769; *Chevron,* 467 U.S. at 863, 104 S.Ct. at 2791.

**28.** Further, even some of the statements cited by plaintiffs which purport to bind PASNY to a cost-based rate for Replacement Power do not suggest that PASNY was bound to such a rate for the indefinite future. To take one statement as an example, consider the January 10, 1961, letter from Chairman Moses to Governor Rockefeller in which PASNY sought approval, pursuant to § 836(b)(3), from the Governor for its contract to sell Replacement Power to Niagara Mohawk. Chairman Moses of PASNY wrote:

> The Authority has conscientiously followed the federal and state statutes with the result that the first 445,000 kw produced will go to

Plaintiffs advance two final arguments. First, plaintiffs argue that the language in § 836(b)(5) of the NRA, which states that "[i]n the event project power is sold to any purchaser for resale, contracts for such sale shall include adequate provisions for establishing resale rates, to be approved by [PASNY], consistent with paragraphs (1) and (3) of this subsection," 16 U.S.C. § 836(b)(5), would be meaningless unless § 836(b)(3) established a cost-based rate standard for Replacement Power. Defendant counters that § 836(b)(5) cannot be read to establish a particular rate standard if no such standard exists in § 836(b)(3). The court finds defendant's argument persuasive. In terms of setting rate standards, § 836(b)(5) has no content of its own; it is entirely dependent on the content of subsections (b)(1) and (b)(3). This point can be seen by comparing § 836(b)(5) with a similar clause in PASNY's enabling statute, which states: "Contracts for the sale, transmission and distribution of power generated by [PASNY's hydroelectric] projects shall provide for the effectuation of the foregoing policy...." N.Y.Pub.Auth.Law § 1005(5). The "foregoing policy," which has been quoted previously in this opinion, set forth two different rate standards: first, a cost-based standard for domestic and rural consumers, and second, a standard for sale to industry as a "secondary purpose, to be utilized principally to secure a sufficiently high load factor and revenue returns to permit domestic and rural use at the lowest possible rates...." *Id.* Both § 1005(5) and § 836(b)(5) direct PASNY to ensure that contracts for sale (or resale) of its hydroelectric power comply with previously-referenced standards. Neither section, however, requires that those standards be cost-based.

This conclusion is not contradicted by the legislative history of the NRA, as there is almost no discussion therein about

§ 836(b)(5). The lone reference to this subsection in the committee reports accompanying the NRA is found in the House Report, *supra,* at 11, which simply rephrases the language quoted above. As stated previously, had Congress intended to set a cost-based standard for Replacement Power, it could have done so in unequivocal language. Section 836(b)(5) simply does not state that Replacement Power must be sold at cost.[29]

Plaintiffs' final argument is that Congress could not have intended to grant PASNY unfettered discretion to determine the rates it would charge for Replacement Power. *See, e.g.* Item 37 at 14 n. 7. This argument, of course, begs the question of what Congress intended without providing meaningful additional evidence or analysis. Besides, PASNY's actions are not completely beyond review. Even in cases where courts have held that Congress has provided "no law to apply," *see OCC v. PASNY,* 758 F.Supp. at 857–58 (discussing cases), if an agency "has ignored a plain statutory duty, exceeded its jurisdiction, or committed constitutional error," a court may step in. *Hahn v. Gottlieb,* 430 F.2d 1243, 1251 (1st Cir.1970). *See also Langevin v. Chenango Court,* 447 F.2d 296, 304 (2d Cir.1971); *Massachusetts Pub. Interest Group v. United States Nuclear Regulatory Comm'n,* 852 F.2d 9, 19 (1st Cir.1985). Moreover, the NRA itself is not without checks on the discretion of PASNY. First, PASNY was required to obtain a license issued by the FPC. Second, PASNY's contract with Niagara Mohawk for the sale of Replacement Power was subject to "the approval of the Governor of the State of New York, pursuant to the procedure established by New York law...." 16 U.S.C. § 836(b)(3). Finally, PASNY was required to convince Niagara Mohawk to consent to the surrender of its FPC license, along with any claims for damages associated there-

---

the completely essential industry which is the lifeblood of the frontier *at the price it costs the Authority to produce it plus a very reasonable wheeling charge to Niagara Mohawk which buys the power from the Authority and delivers it.*

Item 43, Exh. 37 (emphasis added). This statement is made in the present tense. It cannot be

read to obligate PASNY to sell Replacement Power at cost for the indefinite future.

**29.** It appears to this court that the most important element of § 836(b)(5) is that it grants PASNY, as opposed to the FPC, the authority to approve resale rates. This authority is mentioned nowhere else in the NRA.

with, before PASNY could gain access to all of the water flow from the Niagara River. *Id.*

For all the foregoing reasons, the court holds that § 836(b)(3) of the NRA does not require PASNY to sell Replacement Power at cost.

The parties are directed to meet with the court on March 26, 1992, at 2:00 p.m.

So ordered.